#24804-a-SLZ

**2008 SD 98**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

| | |
|---|---|
| STATE OF SOUTH DAKOTA, | Plaintiff and Appellant, |
| v. | |
| GRAND RIVER ENTERPRISES, INC., an alien Corporation, | Defendant and Appellee. |
| | |
| STATE OF SOUTH DAKOTA, | Plaintiff and Appellant, |
| v. | |
| GRAND RIVER ENTERPRISES, INC., a/k/a GRAND RIVER ENTERPRISES SIX NATIONS, LTD., an alien Corporation, | Defendant and Appellee. |
| | |
| STATE OF SOUTH DAKOTA, | Plaintiff and Appellant, |
| v. | |
| GRAND RIVER ENTERPRISES, INC., a/k/a GRAND RIVER ENTERPRISES SIX NATIONS, LTD., an alien Corporation, | Defendant and Appellee. |

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE LORI S. WILBUR
Judge

\* \* \* \*

ARGUED ON AUGUST 27, 2008

OPINION FILED **10/22/08**

\* \* \* \*

LAWRENCE E. LONG
Attorney General

JEFFREY P. HALLEM
Assistant Attorney General          Attorneys for plaintiff
Pierre, South Dakota               and appellant.

HAVEN L. STUCK
GENE N. LEBRUN of
Lynn, Jackson, Shultz & Lebrun, P.C.
Rapid City, South Dakota

AMY L. VANDAMME
PAUL E. BENSON of
Michael Best & Friedrich LLP        Attorneys for defendant
Milwaukee, Wisconsin               and appellee.

#24804

ZINTER, Justice

[¶1.]　　　　Grand River Enterprises Six Nations Ltd. (Grand River), a Canadian cigarette manufacturer, moved the circuit court to vacate three default judgments arising out of the sale of cigarettes in the State of South Dakota.　Grand River argued that the circuit court lacked personal jurisdiction because Grand River had not purposefully availed itself of the South Dakota market sufficient to permit jurisdiction under the Due Process Clause of the Fourteenth Amendment.　After an evidentiary hearing on the merits of the jurisdictional issue, the circuit court granted the motions.　We affirm.

[¶2.]　　　　In 1998, South Dakota and forty-five other states reached a settlement with major cigarette manufacturers[1] to recoup healthcare-related costs incurred as a result of smoking-related illnesses.　The settling manufacturers and the settling states entered into a Master Settlement Agreement (MSA) under which the manufacturers agreed to pay the states annual sums in return for the release of past, present, and future claims.　The MSA included a "Model Escrow Statute" to be adopted by the settling states to protect the settling manufacturers from a competitive disadvantage following an anticipated rise in prices to pass the cost of the settlement onto consumers.

[¶3.]　　　　South Dakota adopted the Model Escrow Statute in SDCL ch 10-50B (Escrow Statutes).　Those statutes impose financial obligations on nonparticipating

---

1.　　The manufacturers included the following companies that controlled up to 98% of the market for tobacco products in 1998:　Phillip Morris, Inc., R.J. Reynolds Tobacco Co., Brown and Williamson Tobacco Corp., and Lorillard Tobacco Co.

-1-

manufacturers (NPMs), which are defined as "tobacco product manufacturer[s] selling cigarettes to consumers within" South Dakota. SDCL 10-50B-7. The Escrow Statutes require NPMs to either join the MSA or place in escrow a certain sum for their cigarettes sold in this State. SDCL 10-50B-6; SDCL 10-50B-7.

[¶4.] Grand River is a company that manufactures cigarettes on an Indian reserve in Ontario, Canada. It is owned by members of the Six Nations, a group of six Indian tribes, also referred to as the Iroquois Confederacy. Grand River operates exclusively on the Six Nations Reserve under the authorization of the governing councils of the Six Nations. Grand River's principal place of business is in Ohsweken, Ontario. It is incorporated under the Canada Business Corporations Act.

[¶5.] Grand River began manufacturing "Seneca" brand cigarettes under a 1999 "Cigarette Manufacturing Agreement" (Agreement) with Native Tobacco Direct.[2] In June 2000, Native Tobacco Direct (NTD) assigned the Agreement to Native Wholesale Supply (NWS). NTD and NWS are owned by Arthur Montour, Jr. Both companies are separate Native legal entities located on an Indian reservation in the State of New York.[3]

---

2. In the Agreement, Native Tobacco Direct is referred to as Native Tobacco Company. To avoid confusion we, like the parties, refer to Native Tobacco Company as Native Tobacco Direct.

3. Grand River also entered into a Cigarette Manufacturing Agreement with Tobaccoville USA, Inc. (Tobaccoville). This agreement related to Tobaccoville's distribution of cigarettes in non-Indian country in the United States. The State argues that Grand River's agreement with Tobaccoville is evidence that Grand River had knowledge of an established distribution network that would reach a retailer like that involved here: the Plaza, an

(continued . . .)

[¶6.]        According to Grand River's Agreement with NTD/NWS, the latter

parties owned the proprietary rights to Seneca brand cigarettes, which included the

trademarks, copyrights, and tobacco blending formulas.  Grand River was granted a

"limited license to use" NTD's/NWS's "proprietary properties" for "the sole purpose

of manufacturing and delivery of the cigarettes" for NTD/NWS.  Agreement, ¶1.

The right to manufacture was limited to "such quantities and at such times as per

the written request from [NTD/NWS] to do so."  *Id.* ¶¶1, 8.  Grand River was also

required to manufacture the cigarettes "according to pre-approved quality

standards" of NTD/NWS, "using the tobacco blends and packaging as designated" by

NTD/NWS.  *Id.* ¶¶1, 4.  Finally, with certain exceptions not applicable here, Grand

River was prohibited from manufacturing Seneca brand cigarettes for itself, or for

any other person or entity.  *Id.* ¶9.

[¶7.]        Following manufacture, Grand River's involvement ended upon its

shipment of the cigarettes, FOB Grand River's facility in Ohsweken, Ontario, to a

"Foreign Trade Zone in Western New York, as designated by [NTD/NWS] in

advance for each delivery."  Agreement, ¶3.  NTD/NWS was responsible for the

---

(. . . continued)

Indian-owned enterprise located in non-Indian country in South Dakota.  *See
infra* ¶8.  The relationship between Grand River and Tobaccoville is,
however, irrelevant to the judgments.  The judgments were based on sales of
cigarettes in 2000, 2001, and 2002; but, according to the NAFTA complaint,
*see infra* ¶28, Grand River and Tobaccoville did not enter into their
agreement until the fall of 2002.  Consequently, the circuit court found that
the cigarettes at issue "did not enter South Dakota through any agreement
between Grand River and Tobaccoville USA, Inc.  Thus, [the Tobaccoville
USA Inc./Grand River] business relationship is irrelevant to this case."  For
this reason, Tobaccoville's distribution activities are not discussed.

payment of "all applicable taxes and duties arising from the importation [of the cigarettes] into the United States and/or Seneca Nation Territory or other Native Territory." *Id.* Thereafter, NTD/NWS distributed the cigarettes without direction or control from Grand River. *Id.* The Agreement did not indicate in which states NTD/NWS might sell its cigarettes.[4]

[¶8.]     In 2000, 2001, and 2002, NTD/NWS delivered the Seneca cigarettes at issue to HCI Distribution Company (HCI). HCI is a Nebraska subsidiary of Ho-Chunk, Inc., a Wisconsin Tribe. HCI acted as a tribal development corporation for the Winnebago Tribe, located on the Winnebago Reservation in Nebraska. After purchasing cigarettes from NTD/NWS, HCI stamped them for sale in South Dakota and sold the cigarettes to tribally-owned clients, including those of the Yankton Sioux Tribe in South Dakota. As is relevant here, HCI sold Seneca cigarettes to the Fort Randall Casino, which is located on the Yankton Sioux Reservation in South Dakota. HCI also sold Seneca cigarettes to the Yankton Sioux Travel Plaza (Plaza), which was owned and operated by the Yankton Sioux Tribe, but which was, unbeknownst to HCI, located in non-Indian country in South Dakota. According to the State's evidence, HCI sold 1,097,760 units[5] of Seneca brand cigarettes in South Dakota in 2000, 1,650,800 units in 2001, and 440,000 units in 2002.

---

4.    The Agreement merely acknowledged that NTD/NWS was a Native business enterprise that distributed cigarettes to Native wholesalers and retailers on Native Territories, and also to other wholesalers and retailers off Native Territories in and outside the United States.

5.    The Escrow Statutes define "units sold" as the "number of individual cigarettes sold in the state by the applicable tobacco product manufacturer . . . during the year in question, as measured by excise taxes collected by the

(continued . . .)

[¶9.]        As a result of these sales, the State filed separate suits against Grand River in 2001, 2002, and 2003.  The complaints alleged that Grand River knowingly violated the Escrow Statutes for the 2000, 2001, and 2002 sales.  Grand River failed to answer or appear, resulting in the entry of default judgments.

[¶10.]        In early 2007, Grand River moved to vacate the judgments under SDCL 15-6-60(b)(4), arguing that the court lacked personal jurisdiction over Grand River.  The circuit court consolidated the actions, and after a hearing on the merits of the motions to vacate, the court issued a detailed decision granting Grand River's motions.  The court concluded that the "State has not demonstrated any action by Grand River to purposefully avail itself to the South Dakota market" thereby precluding this State's exercise of personal jurisdiction under the Due Process Clause of the Fourteenth Amendment.[6]  We review this conclusion regarding jurisdiction as a question of law under the de novo standard of review.  Grajczyk v. Tasca, 2006 SD 55, ¶8, 717 NW2d 624, 627.

[¶11.]        The question of personal jurisdiction over a nonresident involves two initial inquiries:

> First, the court must determine whether the legislature granted the state court jurisdiction over defendants who do not meet the traditional bases for personal jurisdiction.  In South Dakota, this legislative approval is found in the state's Long Arm

---

(. . . continued)
     state on packs bearing the excise tax stamp or imprint of the state[.]"  SDCL 10-50B-6.

6.    The circuit court also concluded that the State's manner of serving the 2001, 2002, and 2003 summonses and complaints was insufficient under South Dakota law and the Hague Convention.  Because the due process issue is dispositive, we do not reach the services of process issues.

Statute.[7] Next, the court must determine whether the proposed assertion of jurisdiction comports with federal due process requirements.

Frankenfeld v. Crompton Corp., 2005 SD 55, ¶9, 697 NW2d 378, 381. For purposes of this opinion, we address only the latter inquiry because, assuming that jurisdiction exists under the Long Arm Statute, the due process inquiry is dispositive.

[¶12.] The Due Process Clause affords protection against judgments of a forum with which a person has no meaningful contacts, ties, or relations. *Id.* ¶10, 697 NW2d at 381-82. To satisfy due process, a putative defendant must have sufficient minimum contacts with the forum state to not offend traditional notions of fair play and substantial justice:

> In *International Shoe*, the United States Supreme Court established the minimum contacts test for determining whether personal jurisdiction comports with Fourteenth Amendment due process. 326 US 316, 66 SCt 158, 90 LEd 95. According to the Court, due process requires that a non-resident defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting

---

7.   This State's relevant Long Arm Statute provides in pertinent part:

> Any person is subject to the jurisdiction of the courts of this state as to any cause of action arising from the doing personally, through any employee, through an agent or through a subsidiary, of any of the following acts:
>
> (1) The transaction of any business within the state;
>      . . . .
> (14) The commission of any act, the basis of which is not inconsistent with the Constitution of this state or with the Constitution of the United States.

SDCL 15-7-2.

> Milliken v. Meyer, 311 US 457, 463, 61 SCt 339, 343, 85 LEd 278 (1940)).

*Id.*

[¶13.]    The minimum contacts issue in this case is whether, through its activities directed at this forum, Grand River "purposefully avail[ed] itself of the privilege of conducting activities within [this] state, thus invoking the benefits and protections of its laws." *See id.* ¶12, 697 NW2d at 382 (citing Hanson v. Denckla, 357 US 235, 253, 78 SCt 1228, 1240, 2 LEd2d 1283 (1958)).  This requires that the defendant's activities must be "purposefully directed" toward the forum.  Burger King v. Rudzewicz, 471 US 462, 472, 105 SCt 2174, 2182, 85 LEd2d 528 (1985).  "It is not enough that it is foreseeable that a defendant's activities may cause injury in a forum." *Frankenfeld*, 2005 SD 55, ¶11, 697 NW2d at 382 (citing World-Wide Volkswagen Corp. v. Woodson, 444 US 286, 295, 100 SCt 559, 566, 62 LEd2d 490 (1980)).  Rather, "the foreseeability that is critical to the due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* (citing *World-Wide Volkswagen*, 444 US at 297, 100 SCt at 567, 62 LEd2d 490).  Further, the defendant's contacts with the forum must "proximately result from actions by the *defendant himself* that create a 'substantial connection' with the forum State." *Burger King*, 471 US at 476, 105 SCt at 2184, 85 LEd2d 528 (citation omitted) (emphasis added).  "Thus, the unilateral activity of a third party with some relationship to a nonresident defendant cannot suffice to establish personal jurisdiction." *Frankenfeld*, 2005 SD 55, ¶12, 697 NW2d at 382 (citing *Denckla*, 357 US at 253, 78 SCt at 1240, 2 LEd2d 1283).

[¶14.] In this case, it is undisputed that Grand River did not have any offices, personnel, real estate, sales agents, bank accounts, or similar connections with South Dakota. Further, Grand River did not advertise or solicit business in South Dakota, and it did not ship to or sell cigarettes in South Dakota. Grand River had no connection with South Dakota other than it manufactured the Seneca cigarettes for NTD/NWS, a New York importer. Thereafter, NTD/NWS sold the cigarettes to HCI, an independent wholesale distributor, located on the Winnebago Reservation in Nebraska, who sold tobacco products primarily to tribally-owned entities. This Nebraska distributor, HCI, was the first entity that paid the tax and stamped the cigarettes for sale in South Dakota. HCI then sold the cigarettes to Yankton Sioux-owned businesses in South Dakota. The Yankton Sioux businesses then sold the cigarettes to consumers in South Dakota.

[¶15.] The Supreme Court analyzes purposeful availment through such distribution networks under a "stream of commerce" standard. Asahi Metal Ind. Co. v. Superior Court of California, 480 US 102, 107 SCt 1026, 94 LEd2d 92 (1987). In *Asahi*, a California resident brought suit in California state court to recover for injuries he sustained when a tire on his motorcycle exploded. The plaintiff sued the tire tube manufacturer, a Taiwanese company, who then impleaded the manufacturer of the tube's valve, a Japanese company. The Japanese manufacturer contested personal jurisdiction, pointing out that it manufactured the valves only in Japan, and that it was the Taiwanese corporation that incorporated the valves into the tubes in Taiwan and sold the finished tubes throughout the world.

[¶16.]     The Supreme Court concluded that California's exertion of personal jurisdiction over the Japanese valve manufacturer exceeded the limits of due process.  *Id.* at 112, 107 SCt at 1032, 94 LEd2d 92.  Delivering judgment for a unanimous Court, Justice O'Connor wrote a plurality opinion expressing the view of four members of the Court, which has become known as the stream of commerce "plus" standard.  Under that standard:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.  Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.  But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.

*Id.* at 112, 107 SCt 1026.

[¶17.]     Justice Brennan, however, expressed the view of four members of the Court that due process did not require the "plus"; i.e., additional conduct.  *Id.* at 117, 107 SCt at 1034, 94 LEd2d 92 (Brennan, J., concurring in part and concurring in the judgment).  In the concurrence's view, "[a] defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity."  *Id.*  Justice Brennan continued, "[t]hese benefits accrue regardless of whether the participant directly conducts business in the forum State, or engages in additional conduct directed toward that

State." *Id.* He opined that Justice O'Connor's stream of commerce "plus" standard "represented a marked retreat from the analysis in *World-Wide Volkswagen*[.]" *Id.* at 118, 107 SCt at 1035, 94 LEd2d 92. According to Justice Brennan, under *World-Wide Volkswagen*, delivery of a product into the stream of commerce with an expectation that it would be purchased in the forum state was sufficient: "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 119, 107 SCt at 1036, 94 LEd2d 92 (citing *World-Wide Volkswagen,* 444 US at 298, 100 SCt at 567, 62 LEd2d 490). Thus, Justice Brennan concluded that minimum contacts were present because: "Asahi was aware of the distribution system's operation, and it knew that it would benefit economically from the sale in California of products incorporating its components." *Id.* at 121, 107 SCt at 1037, 94 LEd2d 92.

[¶18.] In this case, the parties agree that the issue is one of purposeful availment. The parties disagree, however, which standard of purposeful availment applies. The circuit court applied Justice O'Connor's stream of commerce "plus" standard. Grand River contends that this Court adopted that standard when we discussed the issue in *Frankenfeld*, 2005 SD 55, 697 NW2d 378. The State disagrees. The State contends that the circuit court should have applied Justice Brennan's *World-Wide Volkswagen* "expectation" standard as applied by the Eighth Circuit Court of Appeals in *Clune v. Alimak AB*, 233 F3d 538 (8thCir 2000) and *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F3d 610 (8thCir 1994).

Further, the State argues that the South Carolina Supreme Court's recent opinion in *State v. NV Sumatra Tobacco Trading, Co.*, 379 SC 81, 666 SE2d 218 (2008) supports the assertion of personal jurisdiction over Grand River. We review these authorities.

*Frankenfeld*

[¶19.]     In *Frankenfeld*, tire consumers sued multiple defendants (including Crompton and Flexys), alleging that defendants conspired to fix the price of rubber processing chemicals used to manufacture tires. 2005 SD 55, 697 NW2d 378. Crompton was a Connecticut corporation with its principal place of business in Connecticut. It marketed specialty chemical products and processing equipment that were used in the manufacture of rubber and tires. Flexys was a Delaware Corporation with headquarters in Ohio and was the world's leading supplier of chemicals to the rubber industry. Crompton and Flexys sold their rubber processing chemicals to tire manufacturers principally located in Tennessee and North Carolina. After the tires were made, they proceeded along a chain of distribution from manufacturers to distributors, then to retailers, and eventually to consumers. Once Crompton and Flexys sold their chemicals to the tire manufacturers, they had no control over the rest of the marketing chain in which the tires were distributed.

[¶20.]     As in the instant case, both Crompton and Flexys argued that they lacked sufficient minimum contacts with South Dakota rendering personal jurisdiction inappropriate. On appeal, we noted that although no South Dakota case had specifically adopted Justice O'Connor's stream of commerce "plus"

standard, our decision in *Rothluebbers v. Obee*, 2003 SD 95, 668 NW2d 313, was

"more consistent with the 'stream of commerce plus' analysis." 2005 SD 55, ¶19,

697 NW2d at 385. We further stated, "[i]n fact, one of our earlier cases, *Miller v.*

*Weber,* 1996 SD 47, 546 NW2d 865, confirms this analytical framework." *Id.* ¶20,

697 NW2d at 385. Therefore, in *Frankenfeld,* we first applied the stream of

commerce "plus" standard, concluding:

> [A]pplying the analysis from *Asahi, Rothluebbers*, and *Miller*,
> the facts here established that Crompton and Flexys did not
> purposefully avail themselves of the privilege of acting in South
> Dakota. Rather, their products, like the tube valves in *Asahi*,
> were incorporated by a third party into a finished product
> which found its way to South Dakota. At most, Crompton and
> Flexys placed their products into a stream of commerce which
> took them to Tennessee and North Carolina, where they were
> manufactured into a third party's product (tires) and then
> injected into the stream of commerce that eventually lead to
> South Dakota. Further, Crompton and Flexys did not enter
> into a contract with anyone in South Dakota. Because no fact
> suggests that they purposefully availed themselves of the
> benefits and protections of South Dakota's laws, the first
> element of proper personal jurisdiction is lacking.

*Id.* ¶22, 697 NW2d at 385. Significantly, however, we did not rest our holding solely

on this stream of commerce "plus" standard. We noted that even if we were to apply

Justice Brennan's "expectation" standard, personal jurisdiction over the defendants

would have been lacking because the *Frankenfeld* defendants "did not deliver their

products into the stream of commerce with the expectation that they would be

purchased by consumers in South Dakota." *Id.* ¶24, 697 NW2d at 386. Thus,

*Frankenfeld* did not determine which standard should be applied in future cases.

*Clune and Barone*.

[¶21.]     The State argues that we should apply the expectation standard as applied in *Clune* and *Barone*. In those cases, the Eighth Circuit observed that five Justices declined to adopt Justice O'Connor's "plus" standard, and consequently, the Eighth Circuit applied Justice Brennan's expectation analysis from *Asahi* and *World-Wide Volkswagen*. *See Clune,* 233 F3d at 542 (noting: "Although a majority of the *Asahi* Court agreed with Justice O'Connor that jurisdiction was not proper in that case, five Justices refused to adopt her articulation of a stream of commerce 'plus' theory."); *Barone,* 25 F3d at 614 (noting: "Because the Supreme Court established the stream of commerce theory, and a majority of the court has not yet rejected it, we consider that theory to be determinative.") (quoting Dehmlow v. Austin Fireworks*,* 963 F2d 941, 946 (7thCir 1992)).

[¶22.]     *Clune* involved a Swedish manufacturer that had designed construction hoists for the United States market. 233 F3d 538. A Missouri construction worker fell from one of the hoists and brought a wrongful death action in that state. The evidence reflected that the manufacturer had exclusive distribution agreements with United States distributors, and these distributors were a subsidiary of the manufacturer. The *Clune* court observed, "at minimum, [the manufacturer] had constructive knowledge that its construction hoists would end up in Missouri. . . . Also, the intermingling of directors and officers between [the manufacturer and distributor] suggests that the parent was aware of its subsidiary's activities." *Id*. at 545 n9. Thus, the court found that the defendant "head[ed] a distribution network," and the Swedish manufacturer "did more than simply set a product adrift in the international stream of commerce. The record

shows [the defendant] created the distribution system that brought the hoist to Missouri." *Id*. at 543. Based on these facts, the Eighth Circuit concluded that the manufacturer "purposefully directed its products to the United States through the distribution system it set up in this country." *Id*. at 544. The court explained, "[t]he company knew that by virtue of this system, its construction hoists entered Missouri," and the "creation of the system that brought hoists to Missouri established sufficient minimum contacts with that forum to satisfy the due process standards." *Id*. at 544-45.

[¶23.]     *Barone* involved a Nebraska man, injured by fireworks, who sued the fireworks' foreign manufacturer. 25 F3d 610. The Eighth Circuit held that although the manufacturer had no office, agent, or distributor in Nebraska, did not advertise in Nebraska, and did not send any products into Nebraska, it was subject to personal jurisdiction because of the way its products arrived in that state. *Id*. at 615. The court observed that the manufacturer had strategically selected a network of distributors that could reach much of the United States. *Id*. After noting that the manufacturer used nine distributors in six states, the *Barone* court explained that the manufacturer's "strategic choice of distributors that could reach much of the country" was evidence of the manufacturer's efforts "to place its products in the stream of commerce throughout the Midwest[.]" *Id*. at 614. The *Barone* court concluded that "when a seller heads a distribution network it realizes the much greater economic benefit of multiple sales in distant forums, which in turn may satisfy the purposeful availment test." *Id*. at 613. *Barone* ultimately held that because the manufacturer "ha[d] reaped the benefits of *its network* of distributors . .

. it is only reasonable and just that it should now be held accountable in the forum." *Id.* at 615 (emphasis added).

[¶24.] Although the Eighth Circuit declined to apply the stream of commerce "plus" standard, the reasoning of these opinions nevertheless reflects that a manufacturer must do "more than simply set a product adrift in the international stream of commerce." *Clune,* 233 F3d at 543; *see also Barone,* 25 F3d at 615. The court found personal jurisdiction only because those manufacturers expected their products to reach the forum through marketing networks that were created or headed by the defendant manufacturers.

*Sumatra Tobacco*

[¶25.] In *Sumatra Tobacco,* 379 SC 81, 666 SE2d 218, South Carolina brought an action under its Escrow Statutes against Sumatra Tobacco (Sumatra). Sumatra was an Indonesian tobacco product manufacturer. Sumatra alleged that it sold its products solely to a Singapore corporation, UNICO Trading Pte, Ltd. Sumatra admitted, however, that: UNICO may have sold the cigarettes to a British Virgin Islands corporation, Silmar Trading Ltd; and Silmar may have engaged a United States importer based in Florida for the purpose of selling tobacco products manufactured by Sumatra in the United States. Similar to *Clune* and *Barone,* the South Carolina Supreme Court applied the *World-Wide Volkswagen* "expectation" standard and concluded that Sumatra had sufficient minimum contacts with South Carolina based upon the following facts:

> (1) Sumatra admits it manufactured the United brand cigarettes; (2) Sumatra admits it owns the United States trademark for that brand; (3) the Department of Revenue states 6,868,000 United brand cigarettes were sold in South

Carolina in 2001; (4) Sumatra, either on its own or by someone else on its behalf, filed an ingredient report for the United brand cigarettes with the Center for Disease Control; (5) Sumatra admits it packaged its cigarettes in packs and cartons which bear the United States-required health warnings; and (6) the United brand packaging identifies the cigarettes as an "American blend," has a Surgeon General's warning, and shows an eagle and striped packaging.

*Id.* 379 SC 81, *4, 666 SE2d at 223.

[¶26.] Although the circuit court did not have the *Sumatra Tobacco* case for its review, it concluded that similar applications of the expectation standard in *Clune* and *Barone* were "unpersuasive as applied to the facts of [Grand River's] case." The State disagrees, contending that it has shown purposeful availment under these cases and the *World-Wide Volkswagen/Asahi* expectation standard. Alternatively, the State contends that even if stream of commerce "plus" applies, the facts of this case satisfy the "plus." We do not reach the State's "plus" argument because we conclude that the State failed to meet its burden of proof even under the more inclusive expectation standard in *World-Wide Volkswagen/Asahi*. In arriving at this conclusion, we address the factual considerations that the State contends establish purposeful availment under *Clune, Barone, Sumatra Tobacco* and two Ohio decisions.

> 1. *Grand River's relationship with Arthur Montour, Jr., the principal in NTD/NWS, and NTD's/NWS's distribution of Seneca cigarettes within the United States.*

[¶27.] As previously indicated, Arthur Montour, Jr. owns both NTD and NWS, the New York importers/distributors who licensed Grand River to manufacture the cigarettes for them. Although these corporations sold Seneca cigarettes as legal entities separate and apart from Grand River, the State labels

the relationship as a "co-venture" between Arthur Montour, Jr. and the principals of Grand River. The State argues that these principals made statements in other litigation (a complaint filed in a NAFTA dispute) that they were involved in a "co-venture" to manufacture *and* market Seneca cigarettes throughout the United States. The State contends that this marketing co-venture was the type of distribution network that was expected to reach the South Dakota market, thereby establishing personal jurisdiction. Citing *Clune*, 233 F3d at 543-45, and *Barone*, 25 F3d at 613-15.

[¶28.] Unlike *Clune* and *Barone*, however, the State's evidence does not reflect Grand River's utilization of a distribution network that it knew or expected to include the South Dakota market. On the contrary, the NAFTA complaint's co-venture statements only reflect *expected* connections with limited parts of the Canadian and United States market; namely, certain Canadian and New York Indian reservations, the East Coast, Virginia and Nebraska.[8] And, the Nebraska connection mentioned in the NAFTA complaint was with an Indian tribe other than

---

8. The NAFTA complaint reflects that the "co-venture" activities were started only between the principals of Grand River's predecessor and then only to distribute tobacco products "principally on Six Nations territory" in Canada and the United States. NAFTA Complaint, ¶7. When Arthur Montour, Jr., later became involved, distribution was "principally in the East Coast region of the USA," and he became involved because of his experience "throughout Six Nations land." *Id.* ¶8. Later, the three principals expanded their *production* facility to Virginia for the sale of cigarettes "on Six Nations territory." *Id.* ¶14. Finally, when production was ultimately consolidated at Grand River's facility, the NAFTA complaint reflects it was done so for distribution "on Indian land in the USA." *Id.* ¶22.

the one with whom HCI was affiliated.[9]  Thus, the assertions made in connection

with the NAFTA complaint are not evidence of a co-venture to market Seneca

cigarettes for the South Dakota market.  For that reason, this case is unlike *Barone*

because there is no evidence that Grand River poured Seneca cigarettes into a

regional distribution system under circumstances where one should have known

that the product would reach the forum state.  *See Barone,* 25 F3d at 615 (noting,

"in this case the defendant poured its products into regional distributors throughout

the country," one of which served the Midwest market).  This case is also unlike

*Clune* because there was no showing of a parent-subsidiary and interlocking board

of director's relationship between the principals of Grand River and NTD/NWS.  *See*

*Clune*, 233 F3d at 544 (noting that members of the parent's board of directors also

served as directors of its marketing subsidiary and the subsidiary's activities were

intended to generate profits for the parent corporation).

[¶29.]        The State, however, also argues that the 1999 Agreement is no

different than those considered in two Ohio cases:  *State ex rel. Attorney General v.*

*Grand Tobacco*, 171 OhioApp 3d 551, 871 NE2d 1255 (2007) (concluding that

personal jurisdiction existed considering the fact that the distributor's CEO

introduced the defendant manufacturer's cigarettes into the forum state and held

himself out as a representative of the defendant manufacturing company); and

*State v. Bulgartabac Holding Group*, 2007 WL 4395514 (OhioCtApp 2007)

(concluding that personal jurisdiction existed based upon the volume of sales, the

---

9.      The Nebraska relationship did not include Arthur Montour, Jr., and it was
        also limited to a manufacturing facility.

manufacturer's relationship with a distributor, evidence of the manufacturer's involvement in the packaging of the products, and the manufacturer's compliance with federal law). The State further argues that Grand River's activities are similar to those considered in *Sumatra Tobacco, supra.* We disagree.

[¶30.] Unlike *Grand Tobacco*, the State presented no evidence that Arthur Montour, Jr., or NTD/NWS did anything *on behalf of* Grand River to assist in its manufacture of cigarettes for the United States, let alone the South Dakota market.[10] On the contrary, the Agreement reflects that Montour's companies were acting independently on their own behalf in the distribution of cigarettes. Furthermore, unlike *Sumatra Tobacco*[11] and *Bulgartabac*, NTD/NWS owned the proprietary rights to Seneca cigarettes and it merely granted Grand River a limited

---

10. Unlike the instant case, *Grand Tobacco* involved a distributor that was acting on behalf of the manufacturer in several relevant respects:

> The State submitted evidence of a close, ongoing relationship between Grand Tobacco and its distributor, ITP, that went beyond that of a typical manufacturer and importer/distributor, including evidence that ITP's Chief Executive Officer, Jeffrey Uvezian, acted at various times on behalf of Grand Tobacco. More specifically, there was evidence that Uvezian, as "Managing Member, International Tobacco Partners," certified ingredients lists submitted by Grand Tobacco to the Center for Disease Control and Prevention. On the website of the United States Patent and Trademark Office, Uvezian is listed as the "Domestic Representative" for Grand Tobacco. Further, ITP's website, which listed "Bonita," "Tough Guy," and "Garni" brand cigarettes, specifically noted its "affiliation with Grand Tobacco."

171 OhioApp3d at 558-59, 871 NE2d at 1261.

11. As indicated *supra* ¶25, Sumatra (the manufacturer) admitted that it *owned* the United States trademark for the particular brand, and also that Sumatra controlled the packaging of the cigarettes for the United States market. Those pivotal facts are not present in this case.

license to manufacture cigarettes for NTD/NWS in accordance with the latters' direction as to blending, quality, packaging, and quantities for NTD's/NWS's marketing enterprise. Thus, NTD/NWS had exclusive control over the packaging for the markets it desired and it was distributing as an independent corporate importer/distributor of cigarettes. Finally, unlike this case, in *Bulgartabac* the trial court did not make an evidentiary determination whether the plaintiff met its burden of proving personal jurisdiction. That case was appealed before an evidentiary hearing on the merits of personal jurisdiction, and therefore, the Court of Appeal's language only reflected that the evidence, considered "in a light most favorable to finding jurisdiction," established a prima facie case sufficient to shift the burden to the defendant. *Bulgartabac*, 2007 WL 4395514, ¶18. In this case, the matter was tried on the jurisdictional merits, and the circuit court's factual findings on the jurisdictional merits are adverse to the State.

[¶31.] In sum, even if there were no pure, corporate separation between Montour and Grand River's principals, the State's argument does not account for the fact that the State has failed to prove that Grand River was involved in the *distribution* system by which Seneca cigarettes were expected to be sold in South Dakota. Grand River's activities were limited to those of a licensee for NTD/NWS. Further, Grand River's activities ended when the cigarettes were shipped FOB Ohsweken per NTD's/NWS's instructions to a free trade zone in New York. Finally, the State did not prove that Grand River knew or should have known that NTD/NWS was selling to HCI, and that HCI, who the State concedes "primarily s[old] tobacco products to tribally owned entities," would sell to a retailer located off

the reservation in South Dakota. Therefore, we conclude that the State's characterization of Grand River's relations with Montour as a "co-venture" directed at South Dakota is not a correct description of the relationship of these parties. Rather, the businesses involved were the type of "fully independent corporations whose relations with each other [were] contractual only." *World-Wide Volkswagen*, 444 US at 289, 100 SCt at 563, 62 LEd2d 490. Because the State further failed to prove that Grand River's activities were, for the 2000-2002 years at least, expected to reach the South Dakota market, Grand River's relationship with Montour and NTD/NWS fails to establish purposeful availment under *Clune, Barone, Sumatra Tobacco, Grand Tobacco,* and *Bulgartabac.*

> 2. *Grand River's compliance with federal and Nebraska law in manufacturing and delivering Seneca cigarettes.*

[¶32.]    Citing *Bulgartabac,* the State argues that Grand River designed its product for South Dakota by complying with federal and Nebraska requirements for the sale of cigarettes.[12] This argument, however, again fails to recognize that those were not the acts of Grand River: they were the acts of independent third parties.

---

12.    Under the State's argument, a manufacturer who designed its product to comply with federal and Nebraska requirements would -- by that act alone -- be designing its product for sale in *each of the* fifty states. The State offers *Sumatra Tobacco,* in support of this assertion. 379 SC 81, 666 SE2d 218. That case is, however, substantially different because, after a review of six factors, *see supra* ¶25, the court specifically concluded, "Regardless of how the cigarettes arrived in South Carolina," Sumatra's actions indicated "that it purposefully availed itself of conducting business *in all 50 states*, including South Carolina." *Id.* 379 SC 81, *4, 666 SE2d at 223 (emphasis added). There is nothing in this record suggesting that Grand River purposefully availed itself of conducting business in all fifty states.

[¶33.]     It must be emphasized that under the Agreement, Grand River and NTD/NWS were to "*respectively* comply with all applicable laws [requirements] of Canada and the United States regarding the exportation and importation" of Seneca cigarettes.  Agreement, ¶3 (emphasis added).  Thus, for example, although Grand River was responsible for paying all taxes, charges, fees, duties and tariffs arising out of the export from Canada, NTD/NWS was responsible for those matters relating to importation into the United States.  *Id.*  And more importantly, under the Agreement, NTD/NWS -- not Grand River -- was the party responsible for the United States and Nebraska requirements because NTD/NWS alone dictated the relevant manufacturing specifications, like blending, quality, and packaging.  Therefore, in this case, Grand River cannot be charged with those activities.  The State's argument finally fails to recognize it was only after the cigarettes left Grand River's and NTD's/NWS's control that HCI -- which the State concedes is an independent party -- met the requirements for a South Dakota sale by stamping the cigarettes for sale in South Dakota.

[¶34.]     Because NTD/NWS and HCI alone were responsible for the activities necessary to meet United States, Nebraska and South Dakota requirements, their independent acts cannot be attributed to Grand River.  *See Burger King*, 471 US at 475, 105 SCt at 2183, 85 LEd2d 528 (noting that the purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person'") (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 US 408, 417, 104 SCt 1868, 1873, 80 LEd2d 404 (1984)).  *See also Frankenfeld*, 2005 SD 55, ¶12, 697 NW2d at

382 (noting that "it is essential in each case that there be some act by which *the defendant* purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws") (quoting *Denckla,* 357 US at 253, 78 SCt at 1240, 2 LEd2d 1283) (emphasis added).

> 3. *NTD's/NWS's distribution of Seneca cigarettes to HCI for resale, and HCI's licensing and distribution of Seneca cigarettes in South Dakota for sale to consumers.*

[¶35.]         This factor also relates to the unilateral activities of independent third parties, not Grand River. NTD/NWS, without direction or control of Grand River, sold the cigarettes to HCI, a second-level, independent wholesaler. HCI then unilaterally stamped the cigarettes so HCI could sell them in South Dakota. HCI subsequently sold the cigarettes to Yankton Sioux tribal businesses for sale to an ultimate consumer. Thus, the cigarettes passed through a number of independent wholesalers including HCI, and the State failed to prove that Grand River had knowledge, direction or control of HCI's unilateral activities for the three years at issue.

[¶36.]         The State, however, points out that as of August 2001, it notified Grand River by letter that Seneca cigarettes had been sold in South Dakota by HCI. That letter did not, however, indicate that HCI had acquired the cigarettes through the only party with whom Grand River had a relationship; i.e., NTD/NWS. According to Grand River's evidence, it did not acquire such knowledge until 2003, in the course of related litigation involving the State's attempts to enforce the Escrow Statutes. Because the State has not proven that Grand River was aware that HCI was selling cigarettes in South Dakota in 2000-2002, through the

NTD/NWS distribution network with which Grand River was associated, there was insufficient knowledge to meet the expectation standard: Grand River was not "aware of the distribution system's operation[.]" *See Asahi*, 480 US at 121, 107 SCT at 1037, 94 LEd2d 92 (Brennan, J., concurring in part and concurring in the judgment). Under these circumstances, HCI's unilateral activities directed at this State in 2000-2002, do not establish Grand River's purposeful availment to the South Dakota market. *See World-Wide Volkswagen*, 444 US at 298, 100 SCt at 559, 62 LEd2d 490; *Frankenfeld*, 2005 SD 55, ¶12, 697 NW2d at 382.

> *4. The State's action against Grand River as it relates to the sales of cigarettes within the State of South Dakota.*

[¶37.] The State finally argues that personal jurisdiction is conferred by SDCL 10-50B-7,[13] a provision that requires compliance with the Escrow Statutes. The fact that the State brought an action against Grand River for cigarettes "sold in South Dakota" under this statute, however, only begs the question. The question is

---

13. This statute provides in relevant part:

> Any tobacco product manufacturer selling cigarettes to consumers within the state, on or after July 1, 1999, whether directly or through a distributor, retailer, or similar intermediary or intermediaries, shall do one of the following:
>
> > (1) Become a participating manufacturer . . . of the Master Settlement Agreement, and generally perform its financial obligations under the Master Settlement Agreement; or
> > (2) Place into a qualified escrow fund by April fifteenth of the year following the year in question the following amounts, as such amounts are adjusted for inflation:
> > > (b) For 2000: $.0104712 per unit sold;
> > > (c) For each of 2001 and 2002: $.0136125 per unit sold[.]

SDCL 10-50B-7.

whether an action under this statute is permitted by due process. The mere existence of the statute and the fact of this action are not evidence of purposeful availment by Grand River to the South Dakota market.

*Conclusion*

[¶38.] The State's evidence does not establish purposeful availment under *World-Wide Volkswagen*. Grand River: did not advertise or solicit business in South Dakota; had no offices, employees, agents, or personnel in South Dakota; did not design its products to appeal to the South Dakota market or to comply with the laws specific to South Dakota; did not establish channels for advising South Dakota customers; and did not utilize a distributor who had agreed to serve as a sales agent in South Dakota. Further, the State did not establish that Grand River had any expectation that its limited license to manufacture cigarettes for NTD/NWS was, for the years at issue, directing itself to the South Dakota market. In sum, Grand River's only connection with South Dakota was that, as a Canadian cigarette manufacturer, it manufactured cigarettes under a limited license for an independent New York importer/distributor. That importer/distributor subsequently and unilaterally sold the cigarettes to an independent Nebraska distributor, who unilaterally sold those cigarettes to South Dakota Native businesses that ultimately sold the cigarettes in South Dakota. Paraphrasing *World-Wide Volkswagen* with the facts of this case: "It is foreseeable that the purchasers of [cigarettes manufactured] by [Grand River] may take them to [South Dakota]. But the mere 'unilateral activity of those who claim some relationship with [Grand River ] cannot satisfy the requirement of contact with the forum

-25-

State.'" 444 US at 298, 100 SCt at 567, 62 LEd2d 490 (quoting *Denckla,* 357 US at 253, 78 SCt at 1239-40, 2LEd2d 1283). Absent a more significant relationship with or knowledge of this distribution chain suggesting that Grand River expected or should have expected its manufacturing activities to be directed at the South Dakota market during the years 2000-2002, the State failed to demonstrate that Grand River purposefully availed itself of the laws and benefits of South Dakota under the "expectation" standard.

[¶39.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and GIENAPP, Circuit Court Judge, concur.

[¶40.] GIENAPP, Circuit Court Judge sitting for SABERS, Justice, disqualified.