# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1009
_____

Carol Clune; Paul L. Clune;       *
Kelly M. Clune,                   *
                                 *
       Plaintiffs-Appellants,     *
                                 *  Appeal from the United States
    v.                      *  District Court for the
                                 *  Western District of Missouri.
Alimak AB; Alimak Elevator    *
Company;                     *
                                 *
       Defendants,           *
                               *
Industrivarden Service AB,     *
                               *
       Defendant-Appellee.     *

_____

Submitted: September 12, 2000

Filed: December 1, 2000
_____

Before WOLLMAN, Chief Judge, LAY and BRIGHT, Circuit Judges.
_____

LAY, Circuit Judge.

In February 1996, Joseph Clune was working at a construction site in Kansas City, Missouri, for his employer, J.E. Dunn, when he fell from a construction hoist through an unenclosed area on top of the work platform.[1]  He died as a result of the fall. The hoist was manufactured by Linden-Alimak AB, a Swedish corporation that designed and manufactured construction hoists and other lifts.  Industrivarden Service AB ("Industrivarden") is one of two successor companies of Alimak AB. Industrivarden is a shell corporation that has no employees and does not manufacture or sell equipment.  For purposes of this suit, the company exists to handle the liabilities of Linden-Alimak AB/Alimak AB. Linden-Alimak AB sold the hoist F.O.B. Swedish port to Esco Corporation ("Esco") in 1972.  At the time, Esco maintained an office in Oregon and imported the hoist into the United States via Seattle, Washington.

Carol Clune, Paul Clune, and Kelly Clune ("the Clunes"), the wife and children of the decedent, brought a wrongful death suit against Industrivarden.  The district court granted Industrivarden's motion to dismiss for lack of personal jurisdiction.  On appeal, the Clunes argue that the exercise of personal jurisdiction in this case falls under the Missouri long-arm statute and comports with the Due Process Clause of the Fourteenth Amendment.  The district court held that Industrivarden, a Swedish corporation, did not have sufficient minimum contacts with Missouri during the relevant time period to satisfy constitutional personal jurisdiction standards.

We reverse.

---

[1]A construction hoist is a temporary elevator-like structure used by workers during the construction of buildings.

## A.

During the years Linden-Alimak AB/Alimak AB[2] was in business, it used distributors within the United States to sell its products in the United States. From approximately 1960 to 1970, B.M. Heede ("Heede"), a Connecticut corporation, was the exclusive distributor for Linden-Alimak AB. From 1970 to 1974, the company used two distributors for its product: Oregon-based Esco sold the hoists in thirteen western states, while Heede sold the equipment in the rest of the country, including Missouri. Both distributors also sold other manufacturers' products.[3]

When Linden-Alimak AB became Alimak AB in 1983, its American subsidiary followed suit and became Alimak, Inc.[4] Alimak, Inc. continued to be the exclusive

_____

[2]Herein, "Linden-Alimak AB/Alimak AB" refers to the company as it existed before it was sold in 1988. It does not include the "new" Alimak AB. Alimak AB originated in Sweden as a manufacturer of construction equipment. Through a corporate merger in 1968, the company became Linden-Alimak AB and took on business in crane manufacturing. Then in 1983, Linden-Alimak AB dropped its crane manufacturing business and the name "Linden," and became Alimak AB once again. Five years later, the company was sold in two parts. The Alimak name and most of its assets were sold to a company, which continues to manufacture and sell under the Alimak name today. This "new" Alimak AB, as it is referred to by the parties, is not involved in this lawsuit. The liabilities and some of the assets of the "old" Alimak AB were sold to Alivator AB. In 1995, Alivator AB dissolved and merged into a Swedish company called Industrivarden Service AB.

[3]In 1974, Linden-Alimak AB terminated its relationship with Esco, bought a portion of Heede and made Heede its sole distributor in the United States. By 1978, Linden-Alimak AB owned all of Heede, and changed Heede's name to Linden-Alimak, Inc.

[4]Linden-Alimak AB/Alimak AB and Alimak, Inc. were distinct, yet connected, companies. On one hand, Alimak, Inc. maintained its own books, paid employees

United States distributor for its Swedish parent.[5]  As a result of its relationships with these distributors, approximately 700 of Linden-Alimak AB/Alimak AB's construction hoists were sold in the United States by 1986.  Between twenty and forty of those hoists were sold in Missouri.

The district court found that Industrivarden was not subject to personal jurisdiction in Missouri because the company's activities were not sufficiently targeted to that state.  First, the court denied jurisdiction on the stream of commerce theory, finding that Linden-Alimak AB/Alimak AB did not purposefully avail itself of the privilege of conducting business in Missouri.  Second, the court failed to find jurisdiction over Linden-Alimak AB/Alimak AB based on the activities of its subsidiary, Alimak, Inc.  Because it did not find sufficient minimum contacts, the district court did not consider whether exercising personal jurisdiction would comport with fair play and substantial justice under the Due Process Clause.

We review a dismissal for lack of personal jurisdiction de novo.  See Stevens v. Red Wing, 146 F.3d 538, 543 (8th Cir. 1998).  To successfully challenge a dismissal for lack of personal jurisdiction, the plaintiff must make a prima facie showing that jurisdiction is proper.  See id.

---

through its own payroll, provided its own policies, rules and regulations, and paid for its Swedish parent's products when it purchased F.O.B. Swedish port.  On the other hand, Linden-Alimak AB/Alimak AB relied solely on its subsidiary for sales in the United States and provided sales brochures with which to promote its products. Management of Alimak, Inc. went to Sweden to discuss with the parent company issues such as improvement, product support, and anticipated sales.  Alimak AB also sent Swedish employees to the United States to train Alimak, Inc. service technicians.

[5]From this point forward "Alimak, Inc." includes its predecessor, Linden-Alimak, Inc., and refers to the company as it existed until 1988, when its assets and liabilities were sold to separate companies.

We apply a two-part test to the jurisdictional issue. First, whether the forum state's long-arm statute is satisfied, and second, whether the exercise of jurisdiction comports with due process. See id.

**B.**

The Missouri long-arm statute confers jurisdiction over nonresidents who commit tortious acts within the state. See Mo. Rev. Stat. § 506.500.1(3) (2000 Supp.). The Missouri Supreme Court has declared that when the Missouri legislature enacted the long-arm statute, its "ultimate objective was to extend the jurisdiction of the courts of this state over nonresident defendants to that extent permissible under the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States." State v. Pinnell, 454 S.W.2d 889, 892 (Mo.1970) (en banc). Accordingly, Missouri courts have interpreted the statute broadly to cover those cases where the Due Process Clause permits the assertion of personal jurisdiction. See State v. Wiesman, 627 S.W.2d 874, 876 (Mo.1982) (en banc) (citations omitted). Thus, the critical factor in our analysis is whether the exercise of personal jurisdiction in this case comports with due process.

The Due Process Clause establishes the parameters of a state's power to assert personal jurisdiction over a nonresident defendant. See Helicopteros Nacionales De Columbia, S.A. v. Hall, 466 U.S. 408, 413-14 (1984). Due process requires that the defendant "have certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1941)). The Supreme Court has rejected "talismanic" formulas to personal jurisdiction. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 485 (1985). Rather, we must carefully consider the facts of each case to assess the nature of the contacts between the defendant and the forum state. See id. at 486. The factors we weigh include:

-5-

the burden on the defendant, the interests of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies.

Falkirk Mining Co. v. Japan Steel Works, Ltd., 906 F.2d 369, 374 (8th Cir. 1990) (citing Asahi Metal Indust. Co. v. Superior Court, 480 U.S. 102, 113 (1987) (part II.B., joined by eight Justices)). See also Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir. 1977) (reciting factors to consider in determining whether due process is satisfied: nature and quality of defendant's contacts with the forum state; quantity of contacts; relation of the cause of action to those contacts; interest of the forum state in providing a forum for its residents; and convenience of the parties).

The baseline for minimum contacts is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The defendant's contact with the forum state must be such that he or she "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp v. Woodson, 444 U.S. 286, 297 (1980). In World-Wide Volkswagen the Supreme Court recognized that

if the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

Id. In other words, personal jurisdiction may be exercised consonant with due process "over a corporation that delivers its products into the stream of commerce with the

expectation that they will be purchased by consumers in the forum State." Id. at 297-98.

In its most recent discourse on the stream of commerce theory, the Court in Asahi debated whether a foreign manufacturer that places a product in the stream of commerce purposefully avails itself of the privilege of conducting business in a state where the product ultimately is found. Although a majority of the Asahi Court agreed with Justice O'Connor that jurisdiction was not proper in that case, five Justices refused to adopt her articulation of a stream of commerce "plus" theory.[6] See 480 U.S. at 116-22. See also Barone v. Rich Bros. Interstate Display Fireworks, Co., 25 F.3d 614 ("In short, Asahi stands for no more than that it is unreasonable to adjudicate third-party litigation between two foreign companies in this country absent consent by the nonresident defendant.").

In the present case, Linden-Alimak AB/Alimak AB did more than simply set a product adrift in the international stream of commerce. The record shows Linden-Alimak AB/Alimak AB created the distribution system that brought the hoist to Missouri. In Barone, we endorsed the idea that when a seller heads a distribution network it realizes "the much greater economic benefit of multiple sales in distant forums," which in turn "may 'satisfy the purposeful availment test.'" 25 F.3d at 613 (quoting Giotis v. Apollo of the Ozarks, Inc., 800 F.2d 660, 667 (7th Cir. 1986)). Barone was an American employee who was injured by a fireworks display and brought an action against the Japanese manufacturer of the fireworks. Although the manufacturer had no office, agent, or distributor in Nebraska, did not advertise in Nebraska and did not send any of its products into Nebraska, it was subject to personal jurisdiction based on the process by which its products arrived in that state. During the

---

[6]Justice O'Connor opined that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Asahi, 480 U.S. at 112.

relevant time period, the manufacturer used nine distributors in six states. Despite the manufacturer's claim that it had no actual knowledge that one of its distributors sold products in Nebraska, "such ignorance defie[d] reason and could aptly be labeled as 'willful.'" Id. at 613. Its strategic choice of distributors that could reach much of the country was evidence of the manufacturer's efforts "to place its products in the stream of commerce throughout the Midwest and other parts of the country as well." Id. at 614. Because it was difficult to imagine that this effective distribution system was put in place by chance, the manufacturer could not plead ignorance that its products were being distributed into neighboring states. See id. at 613-14. When a foreign manufacturer reaps the benefits of a distribution network in this way, "it is only reasonable and just that it should . . . be held accountable in the forum of the plaintiff's choice . . . ." Id. at 615.

Recently we applied the rule of Barone in Vandelune v. 4B Elevator Components Unlimited, 148 F.3d 943 (8th Cir. 1998), where a worker who was injured in a grain dust explosion in Iowa brought a products liability action against the British manufacturer of a safety device used in the grain elevator. Although the manufacturer in Vandelune had no office, agent, employee, property, or advertising or solicitation campaigns in Iowa, we found that the lack of a direct marketing presence did not necessarily mean that the manufacturer had not purposefully marketed its product in that state. See id. at 948. The following facts led to the conclusion that there were sufficient contacts to support jurisdiction in that case: (1) the appellee designed the product at issue for the United States market; (2) the appellee agreed to distribute its product through affiliates located in the United States; (3) the appellee put its logo and identifying decals on the product; (4) the appellee directly shipped some of its products to a distributor in nearby Illinois; (5) the appellee's employees attended technical support meetings at the distributor's Illinois facilities; and (6) the appellee sold 619 units to an Illinois distributor, 81 of which were resold in Iowa. See id.

The facts alleged by the Clunes are similar to those in Vandelune. Linden-Alimak AB/Alimak AB designed its construction hoists for the United States market. The company had exclusive distribution agreements with United States distributors.[7] The Swedish parent's logo was displayed on products that were sold in the United States. Linden-Alimak AB/Alimak AB also conducted training seminars in the United States for technicians employed by Alimak, Inc. who serviced hoists that were sold by the subsidiary. Of the 700 construction hoists that were sold in the United States by the company's distributors, between twenty and forty ended up in Missouri. This fact alone makes it difficult for us to characterize the hoist's location in Missouri as random, attenuated or fortuitous. See Burger King, 471 U.S. at 475. Additionally, the Swedish parent provided sales brochures and instruction manuals to its distributors for use in promoting and servicing its products in the United States. Members of the Swedish parent's board of directors also served as directors of its subsidiary. Any of these facts, taken alone, might fall short of purposeful availment, however, when taken together they show that Linden-Alimak AB/Alimak AB engaged in a series of activities that were designed to generate profits to the parent from its subsidiaries' sales across the United States.[8]

---

[7]It is worth nothing that the only way a customer in the United States could acquire a Linden-Alimak AB/Alimak AB construction hoist was through the company's exclusive United States distributor. If a customer directly contacted Linden-Alimak AB/Alimak AB, the parent would refer that customer to Alimak, Inc. in the United States.

[8]Industrivarden insists that any contacts its predecessor companies had with Missouri were outside of the time period that is material to the issue of personal jurisdiction. Industrivarden cites a string of cases to support its assertion that minimum contacts must occur at the time the cause of action arose, the time the suit is filed, or a reasonable period of time immediately prior to the filing of the lawsuit. See Brief for Appellee at 15-16. According to Industrivarden, the contacts alleged by the Clunes occurred before 1988, which is outside of the window of personal jurisdiction opportunity for the 1996 incident that gave rise to this case. Although Industrivarden is correct in its statement of the chronological rule, its conclusion cannot stand.

The district court concluded that Industrivarden could not be subject to personal jurisdiction under <u>Vandelune</u> because Linden-Alimak AB/Alimak AB did not send its product "into a regional distributor with the expectation that the distributor [would] penetrate a discrete, multi-State trade area." 148 F.3d at 948. Although we can imagine a case where a foreign manufacturer selects discrete regional distributors for the purpose of penetrating the markets in some states to the exclusion of others, that situation is not before us. The record shows that Linden-Alimak AB/Alimak AB did not seek to limit the states or regions where their construction hoists would be sold. Rather, it utilized distributors that had sales territories across the United States. A foreign manufacturer that successfully employs a number of regional distributors to cover the United States intends to reap the benefits of sales in every state where the distributors market. Similarly, a foreign manufacturer that successfully employs one or two distributors to cover the United States intends to reap the benefit of sales in every state where those distributors market. The difference is one of form, not function, and the practical effect is the same.

We are not persuaded by Industrivarden's argument that it was unaware of what happened to its products after they left Swedish port. "[S]uch ignorance defies reason and could aptly be described as 'willful.'" <u>Barone</u>, 25 F.3d at 613. <u>See</u> <u>also</u> <u>id.</u> at 613 n.4 (explaining how the distinction between what the defendant knew and should have known is immaterial to the personal jurisdiction analysis). If we were to conclude that despite its distribution system, Linden-Alimak AB/Alimak AB did not intend its products to flow into Missouri, we would be bound to the conclusion that the company did not intend its products to flow into *any* of the United States.

---

Linden-Alimak AB/Alimak AB was "present" in Missouri from the time the crane entered Missouri until the time that product ceased to exist in that state. Because the crane must have been present at the time Joseph Clune fell from it, the timing of the contacts was proper for personal jurisdiction purposes.

The facts show that Linden-Alimak AB/Alimak AB purposefully directed its products to the United States through the distribution system it set up in this country. The company knew that by virtue of this system, its construction hoists entered the Missouri and other Midwest markets. Linden-Alimak AB/Alimak AB's creation of the system that brought hoists to Missouri established sufficient minimum contacts with that forum to satisfy the due process standards set by the Supreme Court and followed by this circuit.[9]

---

[9]Industrivarden asserts that the present case comports with post-Asahi Eighth Circuit decisions where we have denied jurisdiction over foreign defendants. We disagree.

In Gould v. P.T. Krakatau Steel, 957 F.2d 573 (8th Cir. 1992), an Indonesian-based defendant entered into a sales contract with a United States distributor, F.O.B. Indonesia. The distributor accepted delivery of the products in Indonesia, transported the products to the United States, and sent a portion of the products to the plaintiff's employer in Arkansas. See id. at 575. The plaintiff later was injured while unpacking the products. See id. In affirming the dismissal by the district court, we found insufficient contacts based on a number of factors, including that the defendant was not licensed to do business in Arkansas, did not have any office, agent, property, bank accounts, or operations in the state, and did not advertise or solicit any business there. See id. at 576.

As an initial matter, Gould involved a commercial dispute between merchants, which is distinct from the Clune's personal injury claim against Industrivarden. See Guinness Import Co. v. Mark II Distributors, Inc., 153 F.3d 607, 615 n.7 (8th Cir. 1998) (noting the incongruity between personal injury claims and commercial disputes). More importantly, Gould involved a limited transaction in the international marketplace. See 957 F.3d at 576. That fact sharply contrasts with the record in the present case, which contains evidence of continuous transactions between Linden-Alimak AB/Alimak AB and its United States distributors.

In Falkirk, 906 F.2d 369 (8th Cir. 1990), a workman in North Dakota was injured while using a defective cam manufactured by the defendant, a foreign company. This court held personal jurisdiction over the alien corporation was precluded by

With minimum contacts satisfied, we must next balance those contacts with the burden on Industrivarden of defending itself in Missouri, the interest of Missouri in adjudicating the dispute, the Clunes' interest in obtaining the most efficient resolution of this matter, the judicial system's interest in obtaining the most efficient resolution of this matter, and the shared interest of the several states in furthering fundamental substantive social policies. See Falkirk, 906 F.2d at 369.

The Supreme Court has noted that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." See Asahi, 480 U.S. at 114 (part II.B., joined by eight Justices). As we have noted, Industrivarden is a shell corporation that has no employees or products

_____

insufficient contacts. See id. at 376. The foreign manufacturer's officials never visited North Dakota to inspect the site where the defective cam was installed and it did not negotiate the contract of sale or discuss design specifications with the plaintiff. See id. at 375. There was no evidence that the manufacturer had any knowledge it was manufacturing cams that were to be installed in North Dakota. See id. Accordingly, we determined that the manufacturer "did nothing more than place its products in the stream of commerce," and concluded that the interest of the plaintiff was best vindicated by an action against the importer, which was the party with whom the manufacturer shared a direct contractual relationship. See id. at 376.

Linden-Alimak AB/Alimak AB's activities cannot be characterized as amounting to "nothing more than place its products in the stream of commerce." Falkirk, 906 F.2d at 376. Contrary to the defendant in Falkirk, who was totally without information about the ultimate destination of its product, Linden-Alimak AB/Alimak AB, at minimum, had constructive knowledge that its construction hoists would end up in Missouri. The parent knew that by 1986, 20 to 40 hoists were sold into the state. Also, the intermingling of directors and officers between Linden-Alimak AB/Alimak AB and Alimak, Inc. suggests that the parent was aware of its subsidiary's activities. See e.g., Iota Management Corp. v. Boulevard Investment Co., 731 S.W.2d 399, 410 (Mo. App. 1987) (corporation is charged with knowledge of its officers and agents).

to sell. Essentially, the company exists through its insurance company. The overwhelming majority of the evidence in this case will be found in Missouri or the surrounding area, such as the construction hoist, eyewitnesses, medical records, and documents material to the incident. As a result, Industrivarden would have to come to Missouri to investigate and gather evidence no matter where a trial were to take place. With the help of modern technology and transportation, Industrivarden easily will be able to collect any relevant documents that are in Sweden and transport them to the United States. For these reasons, any burden Industrivarden might undertake in defending itself in Missouri will be minimal.

It is readily apparent that Missouri has the strongest interest of any forum in adjudicating this dispute. The accident that gave rise to this case occurred in Missouri. Joseph Clune was an employee of the Missouri company, he worked and paid taxes in that state, and his death occurred there as a result of a product sold in that forum. No other state has a more compelling connection to this case.

The Clunes' interest in obtaining convenient and effective relief is best satisfied by adjudicating this dispute in Missouri. Although they are residents of Kansas, Kansas is not a viable venue for this case and Missouri is the closest choice. In any event, Missouri is abundantly more convenient for the Clunes than if this case were to be tried in Sweden. Our decision today in no way guarantees the Clunes success in this suit. However, it likely would be impossible for this family of three who has lost their husband and father to travel abroad to seek restitution for his death.

Trying this case in Missouri federal court also satisfies the judicial system's interest in obtaining the most efficient resolution of this controversy. We exercise caution when subjecting a foreign corporation to jurisdiction in the United States, but are satisfied that Linden-Alimak AB/Alimak AB affirmatively took on the risk of liabilities here.

Finally, the adjudication of this dispute in Missouri ensures the fundamental social policy of safety in goods that enter our marketplace. As commercial borders are dismantled in the increasingly global marketplace, more products are available to consumers in the United States. It is essential that our laws designed to protect the health and safety of human beings not be lost in this flurry of commerce.

The judgment of dismissal by the district court is vacated and the cause is remanded for further proceedings.

BRIGHT, Circuit Judge, concurring.

I concur in the result only.

I do not agree with the stream of commerce theory of the majority. Initially the Swedish manufacturer, Linden-Alimak AB, shipped the construction hoist F.O.B. Swedish port to the Pacific Northwest in the United States. The hoist apparently came into Missouri via a contractor. The application of the stream of commerce theory would subject a foreign entity to suit in any state of the Union where the product ended up, regardless of the original destination for the article or how the particular product happened to be in a particular place in any state.

I believe, however, that the defendant through its subsidiaries was subject to jurisdiction because those subsidiaries were doing business in Missouri. Its subsidiaries, Linden-Alimak Inc. and Alimak Inc., were incorporated in the State of Connecticut. They both held certificates of authority to conduct business in the State of Missouri. They employed sales representatives to cover multi-state territories. These sales representatives sold their companies' products in Missouri.

Courts in the Eighth Circuit have held that they can only assert personal jurisdiction over a foreign parent corporation based on the activities of its resident

subsidiary when the parent corporation dominates and controls the subsidiary to the point that the two companies no longer maintain corporate formalities. See Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc., 519 F.2d 634, 638 (8th Cir. 1975). The district court in the instant case found that the Clunes have not produced any evidence to show that Industrivarden controlled, or had any influence over, its distributors' and subsidiaries' marketing and sales decisions. The district court also noted that the Clunes failed to show that the distributors and subsidiaries were selling in Missouri under the expectations of Industrivarden. Therefore, the district court refused to base jurisdiction over Industrivarden on the activities of its distributors and subsidiaries.

The district court ignored evidence that suggests that Industrivarden exercised control over its subsidiaries' marketing and sales decisions. Industrivarden produced sales brochures which were distributed to residents and consumers in Missouri by its distributors and subsidiaries. At least three members of the subsidiary's board of directors were also directors of the foreign manufacturer. Pursuant to Missouri law, Mo. Rev. Stat. § 351.310 (1986), these directors of the subsidiary "controlled and managed" the business of the subsidiary. These directors made no effort to exclude Missouri from its United States sales. At least two of the directors of the subsidiary were also officers of the foreign manufacturer. Courts have found that to be an important factor in determining whether there are sufficient minimum contacts. See Hawes v. Honda Motor Co., Ltd., 738 F.Supp. 1247, 1251 (E.D. Ark. 1990). Under Missouri law, a corporation is charged with the knowledge of its officers and agents. Iota Mgmt. Corp. v. Boulevard Inv. Co., 731 S.W.2d 399, 410 (Mo. App. 1987). Consequently, the foreign manufacturer had knowledge, through its officers and directors, of all of its subsidiary's contacts, sales, and marketing.

Because of the absence of evidence regarding the issue, I do not here hold that the foreign manufacturer and its subsidiaries are so tightly related that the subsidiaries are mere alter-egos of the parent. Rather, I simply refer to the relationship to support

our conclusion that without the existence of its subsidiaries, Industrivarden would not be able to distribute its product in the United States. This connection between the foreign manufacturer and the resident subsidiary represents more than simply placing a product into the stream of commerce.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.