Justice Ginsburg,
with whom Justice Sotomayor and Justice Kagan join,
dissenting.
A foreign industrialist seeks to develop a market in the United States for machines it manufactures. It hopes to derive substantial revenue from sales it makes to United States purchasers. Where in the United States buyers reside does not matter to this manufacturer. Its goal is simply to sell as much as it can, wherever it can. It excludes no region or State from the market it wishes to reach. But, all things considered, it prefers to avoid products liability litigation in the United States. To that end, it engages a U. S. distributor to ship its machines stateside. Has it succeeded in escaping personal jurisdiction in a State where one of its products is sold and causes injury or even death to a local user?
Under this Court’s pathmarking precedent in International Shoe Co. v. Washington, 326 U. S. 310 (1945), and subsequent decisions, one would expect the answer to be unequivocally, “No.” But instead, six Justices of this Court, in divergent opinions, tell us that the manufacturer has avoided the jurisdiction of our state courts, except perhaps in States where its products are sold in sizeable quantities. Ineon- *894 ceivable as it may have seemed yesterday, the splintered majority today “turn[s] the clock back to the days before modern long-arm statutes when a manufacturer, to avoid being haled into court where a user is injured, need only Pilate-like wash its hands of a product by having independent distributors market it.” Weintraub, A Map Out of the Personal Jurisdiction Labyrinth, 28 U. C. D. L. Rev. 531, 555 (1995).
I
On October 11, 2001, a three-ton metal shearing machine severed four fingers on Robert Nicastro’s right hand. Nicastro v. McIntyre Machinery America, Ltd., 201 N. J. 48, 53, 987 A. 2d 575, 577 (2010); see App. 6a-8a (Complaint). Alleging that the machine was a dangerous product defectively made, Nicastro sought compensation from the machine’s manufacturer, J. McIntyre Machinery, Ltd. (McIntyre UK). Established in 1872 as a United Kingdom corporation, and headquartered in Nottingham, England, McIntyre UK “designs, develops and manufactures a complete range of equipment for metal recycling.” Id., at 22a, 33a. The company’s product line, as advertised on McIntyre UK’s Web site, includes “metal shears, balers, cable and can recycling equipment, furnaces, casting equipment and . . . the world’s best aluminium dross processing and cooling system.” Id., at 31a. McIntyre UK holds both United States and European patents on its technology. 201 N. J., at 55, 987 A. 2d, at 579; App. 36a.
The machine that injured Nicastro, a “McIntyre Model 640 Shear,” sold in the United States for $24,900 in 1995, id., at 43a, and features a “massive cutting capacity,” id., at 44a. According to McIntyre UK’s product brochure, the machine is “use[d] throughout the [wjorld.” Ibid. McIntyre UK represented in the brochure that, by “incorporating] off-the-shelf hydraulic parts from suppliers with international sales outlets,” the 640 Shear’s design guarantees serviceability “wherever [its customers] may be based.” Ibid. The *895 instruction manual advises “owner[s] and operators of a 640 Shear [to] make themselves aware of [applicable health and safety regulations]," including “the American National Standards Institute Regulations (USA) for the use of Scrap Metal Processing Equipment.” Id., at 46a.
Nieastro operated the 640 Shear in the course of his employment at Cureio Scrap Metal (CSM) in Saddle Brook, New Jersey. Id., at 7a, 43a. “New Jersey has long been a hotbed of scrap-metal businesses . . . .” Drake, The Scrap-Heap Rollup Hits New Jersey, Business News New Jersey, June 1, 1998, p. 1. In 2008, New Jersey recycling facilities processed 2,013,730 tons of scrap iron, steel, aluminum, and other metals — more than any other State — outpacing Kentucky, its nearest competitor, by nearly 30 percent. Van Haaren, Themelis, & Goldstein, The State of Garbage in America, 51 BioCycle, No. 10, pp. 16, 19 (Oct. 2010).
CSM’s owner, Frank Cureio, “first heard of [McIntyre UK’s] machine while attending an Institute of Scrap [Recycling] Industries [(ISRI)] convention in Las Vegas in 1994 or 1995, where [McIntyre UK] was an exhibitor.” App. 78a. ISRI “presents the world’s largest scrap recycling industry trade show each year.” Id., at 47a. The event attracts “owners [and] managers of scrap processing companies” and others “interested in seeing — and purchasing — new equipment.” Id., at 48a-49a. According to ISRI, more than 3,000 potential buyers of scrap processing and recycling equipment attend its annual conventions, “primarily because th[e] exposition provides them with the most comprehensive industry-related, shopping experience concentrated in a single, convenient location.” Id., at 47a. Exhibitors who are ISRI members pay $3,000 for 10- by 10-foot booth space. Id., at 48a-49a.[1]
*896 McIntyre UK representatives attended every ISRI convention from 1990 through 2005. Id., at 114a~115a. These annual expositions were held in diverse venues across the United States; in addition to Las Vegas, conventions were held in New Orleans, Orlando, San Antonio, and San Francisco. Ibid. McIntyre UK's president, Michael Pownall, regularly attended ISRI conventions. Ibid. He attended ISRI’s Las Vegas convention the year CSM’s owner first learned of, and saw, the 640 Shear. Id., at 78a-79a, 115a. McIntyre UK exhibited its products at ISRI trade shows, the company acknowledged, hoping to reach “anyone interested in the machine from anywhere in the United States.” Id., at 161a.
Although McIntyre UK's U. S. sales figures are not in the record, it appears that for several years in the 1990's, earnings from sales of McIntyre UK products in the United States “ha[d] been good” in comparison to “the rest of the world.” Id., at 136a (Letter from Sally Johnson, McIntyre UK’s Managing Director, to Gary and Mary Gaither, officers of McIntyre UK’s exclusive distributor in the United States (Jan. 13, 1999)). In response to interrogatories, McIntyre UK stated that its commissioning engineer had installed the company’s equipment in several States — Illinois, Iowa, Kentucky, Virginia, and Washington. . Id., at 119a.
From at least 1995 until 2001, McIntyre UK retained an Ohio-based company, McIntyre Machinery America, Ltd. (McIntyre America), “as its exclusive distributor for the entire United States.” Nicastro v. McIntyre Machinery America, Ltd., 399 N. J. Super. 539, 558, 945 A. 2d 92, 104 (App. Div. 2008).[2] Though similarly named, the two companies were separate and independent entities with “no com *897 monality of ownership or management.” Id., at 545, 945 A. 2d, at 95. In invoices and other written communications, McIntyre America described itself as McIntyre UK’s national distributor, “America’s Link” to “Quality Metal Processing Equipment” from England. App. 43a, 78a.
In a November 23,1999 letter to McIntyre America, McIntyre UK’s president spoke plainly about the manufacturer’s objective in authorizing the exclusive distributorship: “All we wish to do is sell our products in the [United] States— and get paid!” Id., at 134a. Notably, McIntyre America was concerned about U. S. litigation involving McIntyre UK products, in which the distributor had been named as a defendant. McIntyre UK counseled McIntyre America to respond personally to the litigation, but reassured its distributor that “the product was built and designed by McIntyre Machinery in the UK and the buck stops here — if there’s something wrong with the machine.” Id., at 129a-130a. Answering jurisdictional interrogatories, McIntyre UK stated that it had been named as a defendant in lawsuits in Illinois, Kentucky, Massachusetts, and West Virginia. Id., at 98a, 108a. And in correspondence with McIntyre America, McIntyre UK noted that the manufacturer had products liability insurance coverage. Id., at 129a.
Over the years, McIntyre America distributed several McIntyre UK products to U. S. customers, including, in addition to the 640 Shear, McIntyre UK’s “Niagara” and “Tardis” systems, wire strippers, and can machines. Id., at 123a-128a. In promoting McIntyre UK’s products at conventions ■ and demonstration sites and in trade journal advertisements, McIntyre America looked to McIntyre UK for direction and guidance. Ibid. To achieve McIntyre UK’s objective, i. e., “to sell [its] machines to customers throughout the United States,” 399 N. J. Super., at 548, 945 A. 2d, at 97, “the two companies were acting closely in concert with each other,” ibid. McIntyre UK never instructed its distributor to avoid certain States or regions of the country; rather, as just *898 noted, the manufacturer engaged McIntyre America to attract customers “from anywhere in the United States.” App. 161a.
In sum, McIntyre UK’s regular attendance and exhibitions at ISRI conventions was surely a purposeful step to reach customers for its products “anywhere in the United States.” At least as purposeful was McIntyre UK’s engagement of McIntyre America as the conduit for sales of McIntyre UK’s machines to buyers “throughout the United States.” Given McIntyre UK’s endeavors to reach and profit from the United States market as a whole, Nicastro’s suit, I would hold, has been brought in a forum entirely appropriate for the adjudication of his claim. He alleges that McIntyre UK’s shear machine was defectively designed or manufactured and, as a result, caused injury to him at his workplace. The machine arrived in Nicastro’s New Jersey workplace not randomly or fortuitously, but as a result of the U. S. connections and distribution system that McIntyre UK deliberately arranged.[3] On what sensible view of the allocation of adjudicatory authority could the place of Nicastro’s injury within the United States be deemed off limits for his products liability claim against a foreign manufacturer who targeted the United States (including all the States that constitute the Nation) as the territory it sought to develop?
*899 II
A few points on which there should he no genuine debate bear statement at the outset. First, all agree, McIntyre UK surely is not subject to general (all-purpose) jurisdiction in New Jersey courts, for that foreign-country corporation is hardly “at home” in New Jersey. See Goodyear Dunlop Tires Operations, S. A. v. Brown, post, at 919-920, 926-929. The question, rather, is one of specific jurisdiction, which turns on an “affiliatio[n] between the forum and the underlying controversy.” Goodyear Dunlop, post, at 919 (quoting von Mehren & Trautman, Jurisdiction To Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1136 (1966) (hereinafter von Mehren & Trautman) (internal quotation marks omitted)); see also Goodyear Dunlop, post, at 923-924.
Second, no issue of the fair and reasonable allocation of adjudicatory authority among States of the United States is present in this case. New Jersey’s exercise of personal jurisdiction over a foreign manufacturer whose dangerous product caused a workplace injury in New Jersey does not tread on the domain, or diminish the sovereignty, of any other State. Indeed, among States of the United States, the State in which the injury occurred would seem most suitable for litigation of a products liability tort claim. See WorldWide Volkswagen Corp. v. Woodson, 444 U. S. 286, 297 (1980) (if a mánufacturer or distributor endeavors to develop a market for a product in several States, it is reasonable “to subject it to suit in one of those States if its allegedly defective [product] has there been the source of injury”); 28 U. S. C. §1391(a)-(b) (in federal-court suits, whether resting on diversity or federal-question jurisdiction, venue is proper in the judicial district “in which a substantial part of the events or omissions giving rise to the claim occurred”).
Third, the constitutional limits on a state court’s adjudicatory authority derive from considerations of due process, not state sovereignty. As the Court clarified in Insurance *900 Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U. S. 694 (1982):
“The restriction on state sovereign power described in World-Wide Volkswagen Corp. .. . must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns. Furthermore, if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement: Individual actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected.” Id., at 703, n. 10.
See also Shaffer v. Heitner, 433 U. S. 186, 204, and n. 20 (1977) (recognizing that “the mutually exclusive sovereignty of the States [is not] the central concern of the inquiry into personal jurisdiction”). But see ante, at 882 (plurality opinion) (asserting that “sovereign authority,” not “fairness,” is the “central concept” in determining personal jurisdiction).
Finally, in International Shoe itself, and decisions thereafter, the Court has made plain that legal fictions, notably “presence” and “implied consent,” should be discarded, for they conceal the actual bases on which jurisdiction rests. See 326 U. S., at 316, 318; Hutchinson v. Chase & Gilbert, Inc., 45 F. 2d 139, 141 (CA2 1930) (L. Hand, J.) (“nothing is gained by [resort to words that] coneea[l] what we do”). “[T]he relationship among the defendant, the forum, and the litigation” determines whether due process permits the exercise of personal jurisdiction over a defendant, Shaffer, 433 U. S., at 204, and “fictions of implied consent” or “corporate presence” do not advance the proper inquiry, id., at 202. See also Burnham v. Superior Court of Cal., County of *901 Marin, 495 U. S. 604, 618 (1990) (opinion of Scalia, J.) (International Shoe “cast . . . aside” fictions of “consent” and “presence”).
Whatever the state of academic debate over the role of consent in modern jurisdictional doctrines,[4] the plurality's notion that consent is the animating concept draws no support from controlling decisions of this Court. Quite the contrary, the Court has explained, a forum can exercise jurisdiction when its contacts with the controversy are sufficient; invocation of a fictitious consent, the Court has repeatedly said, is unnecessary and unhelpful. See, e. g., Burger King Corp. v. Rudzewicz, 471 U. S. 462, 472 (1985) (Due Process Clause permits “forum ... to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there”); McGee v. International Life Ins. Co., 355 U. S. 220, 222 (1957) (“[T]his Court [has] abandoned ‘consent,' ‘doing business,’ and ‘presence’ as the standard for measuring the extent of state judicial power over [out-of-state] corporations.”).[5]
*902 H — ( H-i ► — <
This case is illustrative of marketing arrangements for sales in the United States common in today’s commercial world.[6] A foreign-country manufacturer engages a U. S. company to promote and distribute the manufacturer’s products, not in any particular State, but anywhere and everywhere in the United States the distributor can attract purchasers. The product proves defective and injures a user in the State where the user lives or works. Often, as here, the manufacturer will have liability insurance covering personal injuries caused by its products. See Cupp, Redesigning Successor Liability, 1999 U. Ill. L. Rev. 845, 870-871 (noting the ready availability of products liability insurance for manufacturers and citing a study showing, “between 1986 and 1996, [such] insurance cost manufacturers, on average, only sixteen cents for each $100 of product sales”); App. 129a-130a.
When industrial accidents happen, a long-arm statute in the State where the injury occurs generally permits assertion of jurisdiction, upon giving proper notice, over the foreign manufacturer. For example, the State’s statute might, provide, as does New York’s long-arm statute, for the “exercise [of] personal jurisdiction over any non-domiciliary . . . who ...
“commits a tortious act without the state causing injury to person or property within the state, . . . if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue *903 from interstate or international commerce.” N. Y. Civ. Prac. Law Ann. § 302(a)(3)(ii) (West 2010).[7]
Or, the State might simply provide, as New Jersey does, for the exercise of jurisdiction “consistent with due process of law.” N. J. Ct. Rule 4:4-4(b)(l) (2011).[8]
The modern approach to jurisdiction over corporations and other legal entities, ushered in by International Shoe, gave prime place to reason and fairness. Is it not fair and reasonable, given the mode of trading of which this case is an example, to require the international seller to defend at the place its products cause injury?[9] Do not litigational convenience[10] and choice-of-law considerations[11] point in that direction? *904 On what measure of reason and fairness can it be considered undue to require McIntyre UK to defend in New Jersey as an incident of its efforts to develop a market for its industrial machines anywhere and everywhere in the United States?[12] Is not the burden on McIntyre UK to defend in New Jersey fair, i. e., a reasonable cost of transacting business internationally, in comparison to the burden on Nicastro to go to Nottingham, England, to gain recompense for an injury he sustained using McIntyre’s product at his workplace in Saddle Brook, New Jersey?
McIntyre UK dealt with the United States as a single market. Like most foreign manufacturers, it was concerned not with the prospect of suit in State X as opposed to State Y, but rather with its subjection to suit anywhere in the United States. See Hay, Judicial Jurisdiction Over Foreign-Country Corporate Defendants — Comments on Recent Case Law, 63 Ore. L. Rev. 431, 433 (1984) (hereinafter Hay). As a McIntyre UK officer wrote in an e-mail to McIntyre America: “American law — who needs it?!” App. 129a-130a (e-mai] dated April 26, 1999, from Sally Johnson to Mary Gaither). If McIntyre UK is answerable in the United States at all, is it not ‘‘perfectly appropriate to permit the exercise of that jurisdiction ... at the place of injury”? See Hay 435; Degnan & Kane, The Exercise of Jurisdiction Over and Enforcement of Judgments Against Alien Defendants, 39 *905 Hastings L. J. 799, 813-815 (1988) (noting that “[i]n the international order,” the State that counts is the United States, not its component States,[13] and that the fair place of suit within the United States is essentially a question of venue).
In sum, McIntyre UK, by engaging McIntyre America to promote and sell its machines in the United States, “purposefully availed itself” of the United States market nationwide, not a market in a single State or a discrete collection of States. McIntyre UK thereby availed itself of the market of all States in which its products were sold by its exclusive distributor. “Th[e] 'purposeful availment’ requirement,” this Court has explained, simply “ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random/ 'fortuitous/ or 'attenuated’ contacts.” Burger King, 471 U. S., at 475. Adjudicatory authority is appropriately exercised where “actions by the defendant himself” give rise to the affiliation with the forum. Ibid. How could McIntyre UK not have intended, by its actions targeting a national market, to sell products in the fourth-largest destination for imports among all States of the United States and the largest scrap metal market? See supra, at 895, 902, n. 6. But see ante, at 886 (plurality opinion) (manufacturer’s purposeful efforts to sell its products nationwide are “not . . . relevant” to the personal jurisdiction inquiry).
*906 Courts, both state and federal, confronting facts similar to those here, have rightly rejected the conclusion that a manufacturer selling its products across the USA may evade jurisdiction in any and all States, including the State where its defective product is distributed and causes injury. They have held, instead, that it would undermine principles of fundamental fairness to insulate the foreign manufacturer from accountability in court at the place within the United States where the manufacturer’s products caused injury. See, e. g., Tobin v. Astra Pharmaceutical Prods., Inc., 993 F. 2d 528, 544 (CA6 1993); A Uberti & C. v. Leonardo, 181 Ariz. 565, 573, 892 P. 2d 1354, 1362 (1995).[14]
IV
A
While this Court has not considered in any prior case the now-prevalent pattern presented here — a foreign-country manufacturer enlisting a U. S. distributor to develop a market in the United States for the manufacturer’s products— none of the Court’s decisions tug against the judgment made by the New Jersey Supreme Court. McIntyre contends otherwise, citing World-Wide Volkswagen and Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty., 480 U. S. 102 (1987).
World-Wide Volkswagen concerned a New York car dealership that sold solely in the New York market, and a New York distributor who supplied retailers in three States only: New York, Connecticut, and New Jersey. 444 U. S., at 289. New York residents had purchased an Audi from the New York dealer and were driving the new vehicle through Oklahoma en route to Arizona. On the road in Oklahoma, another car struck the Audi in the rear, causing a fire which severely burned the Audi’s occupants. Id., at 288. Rejecting the Oklahoma courts’ assertion of jurisdiction over the *907 New York dealer and distributor, this Court observed that the defendants had done nothing to serve the market for cars in Oklahoma. Id., at 295-298. Jurisdiction, the Court held, could not be based on the customer’s unilateral act of driving the vehicle to Oklahoma. Id., át 298; see Asahi, 480 U. S., at 109 (opinion of O’Connor, J.) (World-Wide Volkswagen “rejected the assertion that a consumer’s unilateral act of bringing the defendant’s product into the forum State was a sufficient constitutional basis for personal jurisdiction over the defendant").
Notably, the foreign manufacturer of the Audi in WorldWide Volkswagen did not object to the jurisdiction of the Oklahoma courts and the U. S. importer abandoned its initially stated objection. 444 U. S., at 288, and n. 3. And most relevant here, the Court’s opinion indicates that an objection to jurisdiction by the manufacturer or national distributor would have been unavailing. To reiterate, the Court said in World-Wide Volkswagen that, when a manufacturer or distributor aims to sell its product to customers in several States, it is reasonable “to subject it to suit in [any] one of those States if its allegedly defective [product] has there been the source of injury.” Id., at 297.
Asahi arose out of a motorcycle accident in California. Plaintiff, a California resident injured in the accident, sued the Taiwanese manufacturer of the motorcycle’s tire tubes, claiming that defects in its product caused the accident. The tube manufacturer cross-claimed against Asahi, the Japanese maker of the valve assembly, and Asahi contested the California courts’ jurisdiction. By the time the case reached this Court, the injured plaintiff had settled his case and only the indemnity claim by the Taiwanese company against the Japanese valve-assembly manufacturer remained.
The decision was not a close call. The Court had before it a foreign plaintiff, the Taiwanese manufacturer, and a foreign defendant, the Japanese valve-assembly maker, and the indemnification dispute concerned a transaction between *908 those parties that occurred abroad. All agreed on the bottom line: The Japanese valve-assembly manufacturer was not reasonably brought into the California courts to litigate a dispute with another foreign party over a transaction that took place outside the United States.
Given the confines of the controversy, the dueling opinions of Justice Brennan and Justice O’Connor were hardly necessary. How the Court would have “estimate[d]... the inconveniences,” International Shoe, 326 U. S., at 317 (internal quotation marks omitted), had the injured Californian originally sued Asahi is a debatable question. Would this Court have given the same weight to the burdens on the foreign defendant had those been counterbalanced by the burdens litigating in Japan imposed on the local California plaintiff? Cf. Calder v. Jones, 465 U. S. 783, 788 (1984) (a plaintiff’s contacts with the forum “may be so manifold as to permit jurisdiction when it would not exist in their absence”).
In any event, Asahi, unlike McIntyre UK, did not itself seek out customers in the United States, it engaged no distributor to promote its wares here, it appeared at no Lrade-shows in the United States, and, of course, it had no Web site advertising its products to the world. Moreover, Asahi was a component-part manufacturer with “little control over the final destination of its products once they were delivered into the stream of commerce.” A. Uberti, 181 Ariz., at 572, 892 P. 2d, at 1361. It was important to the Court in Asahi that “those who use Asahi components in their final products, and sell those products in California, [would be] subject to the application of California tort law.” 480 U. S., at 115 (majority opinion). To hold that Asahi controls this case would, to put it bluntly, be dead wrong.[15]
*909 B
The Court’s judgment also puts United States plaintiffs at a disadvantage in comparison to similarly situated complainants elsewhere in the world. Of particular note, within the European Union, in which the United Kingdom is a participant, the jurisdiction New Jersey would have exercised is not at all exceptional. The European Regulation on Jurisdiction and the Recognition and Enforcement of Judgments provides for the exercise of specific jurisdiction “in matters relating to tort ... in the courts for the place where the harmful event occurred.” Council Reg. 44/2001, Art. 5,2001 O. J. (L. 12) 4.[16] The European Court of Justice has interpreted this prescription to authorize jurisdiction either where the harmful act occurred or at the place of injury. See Handelskwekerij G. J. Bier B. V. v. Mines de Potasse d’Alsace S. A., 1976 E. C. R. 1735, 1748-1749.[17]
V
The commentators who gave names to what we now call “general jurisdiction” and “specific jurisdiction” anticipated that when the latter achieves its full growth, considerations of litigational convenience and the respective situations of the parties would determine when it is appropriate to sub- *910 jeet a defendant to trial in the plaintiff’s community. See von Mehren & Trautman 1166-1179. Litigational considerations include “the convenience of witnesses and the ease of ascertaining the governing law.” Id., at 1168-1169. As to the parties, courts would differently appraise two situations: (1) cases involving a substantially local plaintiff, like Nicas-tro, injured by the activity of a defendant engaged in interstate or international trade; and (2) cases in which the defendant is a natural or legal person whose economic activities and legal involvements are largely home based, i. e., entities without designs to gain substantial revenue from sales in distant markets. See id., at 1167-1169.[18] As the attached appendix of illustrative cases indicates, courts presented with von Mehren and Trautman's first scenario — a local plaintiff injured by the activity of a manufacturer seeking to exploit a multistate or global market — have repeatedly confirmed that jurisdiction is appropriately exercised by courts of the place where the product was sold and caused injury.
* * *
For the reasons stated, I would hold McIntyre UK answerable in New Jersey for the harm Nicastro suffered at his workplace in that State using McIntyre UK’s shearing machine. While I dissent from the Court’s judgment, I take heart that the plurality opinion does not speak for the Court, for that opinion would take a giant step away from the “notions of fair play and substantial justice” underlying International Shoe. 326 U. S., at 316 (internal quotation marks omitted).
APPENDIX
Illustrative cases upholding exercise of personal jurisdiction over an alien or out-of-state corporation that, through a *911 distributor, targeted a national market, including any and all States:[19]
Clune v. Alimak AB, 233 F. 3d 538, 544 (CA8 2000) (wrongful-death action against the Swedish manufacturer of a construction hoist that allegedly caused a workplace death in Missouri; holding the manufacturer amenable to suit in Missouri, the Eighth Circuit stated: “Although we can imagine a case where a foreign manufacturer selects discrete regional distributors for the purpose of penetrating the markets in some states to the exclusion of others, that situation is not before us.” In this case, the foreign manufacturer had “successfully employed] one or two distributors to cover the [entire] United States[,] intending] to reap the benefit of sales in every state where those distributors market.” Were the court to conclude that the manufacturer “did not intend its products to flow into Missouri,” the court “would be bound to the conclusion that the [manufacturer] did not intend its products to flow into any of the United States.”).
Kernan v. Kurz-Hastings, Inc., 175 F. 3d 236, 242-244 (CA2 1999) (products liability action against the Japanese manufacturer of an allegedly defective stamping press that caused a workplace injury in New York; holding the manufacturer amenable to suit in New York, the Second Circuit stated that an “exclusive sales rights agreement” between the Japanese manufacturer and a Pennsylvania distributor “contemplates that [the distributor] will sell [the manufacturer’s] machines in North America and throughout the world, serving] as evidence of [the manufacturer’s] attempt to serve the New York market, albeit indirectly” (internal quotation marks omitted)).
Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F. 3d 610, 613-615 (CA8 1994) (products liability suit against a Japanese fireworks manufacturer for injuries sustained in *912 Nebraska; Eighth Circuit, held the manufacturer amenable to suit in Nebraska, although the manufacturer had no distributor or sales agents in that State, did not advertise in Nebraska, and claimed it was unaware that its distributors sold products there; Court of Appeals stated: “In this age of [North American Free Trade Agreement] and [General Agreement on Tariffs and Trade], one can expect further globalization of commerce, and it is only reasonable for companies that distribute allegedly defective products through regional distributors in this country to anticipate being haled into court by plaintiffs in their home states.”).
Tobin v. Astra Pharmaceutical Prods., Inc., 993 F. 2d 528, 544 (CA6 1993) (products liability action against the Dutch pharmaceutical manufacturer of a drug alleged to have caused Kentucky resident’s heart disease; holding the manufacturer amenable to suit in Kentucky, the Sixth Circuit reasoned: “[Defendant] argues that it has done nothing in particular to purposefully avail itself of the Kentucky market as distinguished from any other state in the union. If we were to accept defendant’s argument on this point, a foreign manufacturer could insulate itself from liability in each of the fifty states simply by using an independent national distributor to market its products.”).
Hedrick v. Daiko Shoji Co., 715 F. 2d 1355,1358 (CA9 1983) (products liability suit arising from injuries plaintiff sustained in Oregon caused by an allegedly defective wire-rope splice manufactured in Japan; holding the Japanese manufacturer amenable to suit in Oregon, the Ninth Circuit noted that the manufacturer “performed a forum-related act when it produced a splice that it knew was destined for oceangoing vessels serving United States ports, including those of Oregon”).
Oswalt v. Scripto, Inc., 616 F. 2d 191, 200 (CA5 1980) (products liability action stemming from an injury plaintiff sustained in Texas when using a cigarette lighter made in Japan; holding the manufacturer amenable to suit in Texas, *913 the Fifth Circuit noted that the manufacturer “had every reason to believe its product would be sold to a nationwide market, that is, in any or all states”).
Stokes v. L. Geismar, S. A, 815 F. Supp. 904, 907 (ED Va. 1993), aff’d on other grounds, 16 F. 3d 411 (CA4 1994) (action by worker injured in Virginia while using a rail-cutting saw manufactured by a French corporation; holding the manufacturer amenable to suit in Virginia, the District Court noted that there was “no evidence of any attempt... to limit th[e] U. S. marketing strategy to avoid Virginia or any other particular state”).
Felty v. Conaway Processing Equip. Co, 738 F. Supp. 917, 919-920 (ED Pa. 1990) (personal injury suit against the Dutch manufacturer of a poultry processing machine that allegedly caused injury in Pennsylvania; holding the manufacturer amenable to suit in Pennsylvania, the District Court observed that the manufacturer “clearly and purposefully used [distributors] to deal in the international market for poultry processing equipment” and was “well aware that its equipment was being sold for use in the United States, including Pennsylvania”).
Scanlan v. Norma, Projektil Fabrik, 345 F. Supp. 292, 293 (Mont. 1972) (products liability action occasioned by defect in ammunition used while hunting in Montana; plaintiff sued the Swedish ammunition manufacturer; holding the manufacturer amenable to suit in Montana, the District Court noted that the distributor intended “a nationwide product distribution”).
Ex parte DBI, Inc., 23 So. 3d 635, 654-655 (Ala. 2009) (wrongful-death action arising out of an automobile accident in Alabama; plaintiff sued the Korean manufacturer of an allegedly defective seatbelt; Supreme Court of Alabama held the manufacturer amenable to suit in Alabama, although the manufacturer had supplied its seatbelts to the carmaker in Korea and “maintain[ed] there [was] no evidence ... showing that it knew its products were being marketed in Alabama”).
*914 A. Uberti & C. v. Leonardo, 181 Ariz. 565, 573, 892 P. 2d 1354, 1362 (1995) (wrongful-death action against the Italian manufacturer of an allogcdly defective handgun that caused child’s death in Arizona; Arizona Supreme Court stated: “[F]or all this record shows, Defendant never heard of Arizona. This raises the following question: Having shown that the gun was knowingly designed for and exported to exploit the market of the United States or western United States, must Plaintiffs additionally show that Defendant had the specific intent to market the gun in Arizona, or is it enough to show that Defendant intended to market it in any state, group of states, or all states? We conclude that only the latter is necessary.”).
Hill by Hill v. Showa Denko, K. K., 188 W. Va. 654, 661, 425 S. E. 2d 609, 616 (1992) (products liability suit against the Japanese manufacturer of a sleep aid alleged to have caused West Virginia plaintiff’s blood disorder; holding the manufacturer amenable to suit in West Virginia, that State’s Supreme Court noted that the manufacturer had profited from sales in the United States and considered it unfair to “requir[e] the plaintiff to travel to Japan to litigate th[e] case”).

 New Jersey is home to nearly 100 ISRI members. See Institute of Scrap Recycling Industries, Inc., Member Directory, http://www.isri.org/ imisl5_prod/coro/diroctory.aspx (all Internet materials as visited June 24, 2011, and included in Clerk of Court’s case file).

 McIntyre America filed for bankruptcy in 2001, is no longer operating, and has not participated in this lawsuit. Brief for Petitioner 3. After “the demise of... McIntyre America,” McIntyre UK authorized a Texas-based company to serve as exclusive United States distributor of McIntyre UK shears. App. 52a-53a (internal quotation marks omitted).

 MeIntyro UK resisted Nieaotro’o cfforto to determine whether other McIntyre machinco had been sold to New Jersey customcra. Sec id., at 100a-101a. McIntyre did allow that McIntyre America “may have resold products it purchased from [McIntyre UK] to a buyer in New Jersey,” id., at 117a, but oaid it kept no record of the ultimate destination of machines it chipped to ito distributor, ibid. A private investigator engaged by Ni-eactro found at leant one McIntyre UK machine, of unspecified type, in use in New Jersey. Id., at 140a-144a. But McIntyre UK objected that the investigator’s report was “unsworn and baaed upon hearsay.” Reply Brief 10. Moreover, McIntyre UK maintained, no evidence showed that the machino tho invostigator found in Now Jcrocy had boon “cold into [that State].” Ibid, (internal quotation marks omitted).

 Compare Brilmayer, Rights, Fairness, and Choice of Law, 98 Yale L. J. 1277, 1804-1806 (1989) (hereinafter Brilmayer) (criticizing as drcular jurisdictional theories founded on. “consent” or “[sjubrnissicm to state authority”); Perdue, Personal Jurisdiction and the Beetle in. the Box, 32 Boston College L. Rev. 529, 586-044 (1991) (same), with Trangsrud, The Federal Common Law of Personal Jurisdiction, 57 Geo. Wash. L. Rev. 849, 884-885 (1989) (endorsing a consent-based doctrine of personal jurisdiction); Epstein, Consent, Not Power, as the Basis of Jurisdiction, 2001U. Chi, Legal Forum 1, 2, 80-32 (urging that “the consent principle neatly explains the dynamieo of many of our jurisdictional doctrines,” but recognising that in tort cases, the victim ordinarily should bo able to cue in the place where the harm occurred).

 But see ante, at 880-884 (plurality opinion) (maintaining that a forum may be fair and reasonable, based on its linios to the episode in suit, yet off limits because the defendant has not submitted to the State’s authority). The plurality’s notion that jurisdiction over foreign corporations depends upon the defendant’s “submission,” emto, at 881, scorns scarcely different from the long -discredited fiction of implied consent. It bears emphasis that a majority of this Court's Members do not share the plurality’s view.

 Last year, the United States imported nearly $2 trillion in foreign goods. Census Bureau, U. S. International Trade in Goods and Services 1 (FT-900, Apr. 2011), http://www.census.gov/foreign-trade/Press-Release/ eurrent_press_release/ft900.pdf. Capital goods, such as the metal shear machine that injurod Nieastro, accounted for almost $150 billion in imports for 2010. Id., at 6. New Jersey is the fourth-largest destination for manufactured commodities imported into the United States, after California, Texas, and New York. Id., FT-900 Supplement, p. 3.

 This provision was modeled in part on the Uniform Interstate and International Procedure Act. See N. Y. Legislative Doe. 90, Judicial Conference of the State of New York, 11th Ann. Rep. 132-147 (1966). Connecticut’s long arm statute also uses the “derives substantial revenue from interstate or international commerce” formulation. See Conn. Gen. Stat. § 52-59b(a) (2011).

 State long arm provisions allow the exorcise of jurisdiction subject only to a due process limitation in Alabama, Arkansas, California, Colorado, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mary-, land, Michigan, Minnesota, Missouri, Nevada, North Dakota, Oregon, Pennsylvania, Puerto Rico, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, and West Virginia. 4 C. Wright & A. Miller, Federal Practice and Procedure § 1068, pp. 577-578, n. 12 (3d ed. 2002).

 The plurality objects to a jurisdictional approach “divorced from traditional practice.” Ante, at 880. But “the fundamental transformation of our national oconomy,” this Court has recognised, warranto enlargement of “tho pormissiblo scope of state jurisdiction over foreign corporations and other nonresidents.” McGee v. International Life Ins. Co., 355 U. S. 220, 222-223 (1957).

 See von Mehren & Trautman, Jurisdiction To Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1167 (1966) (“[Considerations of litiga-tional Gonvenieneo, particularly with respect to the taking of evidence, tend in accident cases to point ineiotently to the community in which the accident occurred.”).

 Historically, “tort cases were governed by the place where the last act giving rise to a claim occurred — that is, the place of injury.” Brilmayer 1291-1292. Evon as many jurisdictions have modified the traditional rule *904 of loto looi dolioti, tho location of injury continues to hold sway in choico of-law analysis in tort cases. See generally Whytoek, Myth of Mess? International Choice of Law in Action, 84 N. Y. U. L. Rev. 719 (2009).

 The plurality suggests that the Due Process Clause might permit a federal district court in Now Jersey, sitting in diversity and applying Now Jersey law, to adjudicate McIntyre UK’s liability to Nicastro. Sec anto¡ at 885-886. In other words, McIntyre UK might be compelled to bear tho burden of traveling to Now Jersey and defending itoclf there under New Jersey’s products liability law, but would be entitled to federal adjudi ■ cation of Nicastro’s state-law claim. I see no basis in the Due Process Clause for such a curious limitation.

 “For purposes of international law and foreign relations, the separate identities of individual states of the Union are generally irrelevant.” Bom, Reflections on Judicial Jurisdiction in International Cases, 17 Ga. J. Int’l & Comp. L. 1,36 (1987). See also Hines v. Davidowitz, 312 U. S. 52, 63 (1941) (“For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.” (internal quotation marks omitted)); Restatement (Third) of Foreign Relations Law of the United States §421, Comment/, p. 307 (1986) (“International law . . . does not concern itself with the allocation of jurisdiction among domestic eourts within a [nation,] for example, between national and local courts in a federal system.”).

 For a more complete set of examples, see Appendix, infra.

 The plurality notes the low volume of sales in New Jersey, ante, at 878, 886; A $21,900 ohoaring machine, however, is unlikely to oell in bulk worldwide, much leso in any given State. By dollar value, the price of a single machine represents a significant sale. Had a manufacturer sold in *909 New Jersey $24,900 worth of fiannol shirts, see Nelson v. Park Industries, Inc., 717 F. 2d 1120 (CA7 1983), cigarette lighters, see Oswalt v. Scripto, Inc., 616 F. 2d 191 (CA5 1980), or wire-rope splices, see Hedrick v. Daiko Shoji Co., 715 F. 2d 1355 (CA9 1983), the Court would presumably find the defendant amenable to suit in that State.

 The Regulation replaced the “European” or “Brussels” Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, entered into in 1968 by the original Common Market member states. In the interim, the Lugano Convention “extended the Brussels Convention scheme to [European Free Trade Association] countries.” Clermont & Palmer, Exorbitant Jurisdiction, 58 Me. L. Rev. 474, 491, n. 82 (2006).

 For a concise comparison of the European regime and this Court’s decisions, see Weintraub, A Map Out of the. Personal Jurisdiction Labyrinth, 28 U. C. D. L. Rev. 531, 550-554 (1995).

 Assigning weight to the local or international stage on which the parties operate would, to a considerable extent, answer the concerns expressed by Justice Breyer. See ante, at 891-893 (opinion concurring in judgment).

 The listed casos aro by no means exhaustive of decisions fitting this pattern. For additional citations, see Brief for Public Citizen, Inc., as Amicus Curiae 16, n. 5.